Herman Franck, Esq. (SB #123476)
Elizabeth Betowski, Esq. (SB #245772)
**FRANCK & ASSOCIATES**
910 Florin Road #212
Sacramento, CA 95831
Tel. (916) 447-8400
Email: franckhermanlaw88@yahoo.com

Attorneys for Plaintiffs Seng Xiong, Thao Xiong, Lor Vang, Lue Vang

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SENG XIONG; THAO XIONG; LOR VANG; and LUE VANG | Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT FOR VIOLATION OF THE ALIEN TORT CLAIMS ACT, INJUNCTIVE RELIEF; DECLARATORY RELIEF; ATTORNEYS FEES; REQUEST FOR JURY TRIAL** |
| **LAO PEOPLE'S DEMOCRATIC REPUBLIC; PRESIDENT THONGLOUN SISOULITHIS; PRIME MINISTER SONXAI SIPHANDON; SOUANSAVAN VI-GNAKET, MINSTER OF JUSTICE; GENERAL CHANSAMONE CHANYALATH, MINISTER OF DEFENSE; LIEUTENANT GENERAL VILAY LAKHAMFONG, MINISTER OF PUBLIC SECURITY; DR. YANG DAO** | |
| Defendants | |

Plaintiffs Seng Xiong, Thao Xiong, Lor Vang, and Lue Vang hereby allege and state as follows:

I.
**JURISDICTION AND VENUE**

1. Jurisdiction in this Court is pursuant to 28 U.S.C section 1331 [Federal Question Jurisdiction] as these claims are based on federal law, 28 U.S.C 1350 [Alien Tort Claims Act].

2. Under the Alien Tort Claims Act, 28 U.S.C section 1350, Defendant may choose a venue in a court most convenient to Plaintiffs. Plaintiffs choose the Eastern District of Sacramento due to its proximity to their attorney Herman Franck, Esq.'s, Franck & Associates, Sacramento, California office.

3. Venue is further based on the fact that a substantial amount of the controversy occurrences and damages occurred in the Eastern District of California.

II.
**PARTIES**

4. Plaintiff SENG XIONG is an individual residing in Minneapolis, Minnesota, United States of America. Seng Xiong is an alien, and is not a citizen of the United States of America. He was born in Royal Laos, and was formerly a citizen of the Kingdon of Laos. Following the process of ending the Vietnam War, he fled Laos and arrived in Thailand, where he obtained refugee status and refugee visa, allowing him to come to the United States. He later obtained, and currently has a permanent resident visa for the United States.

5. Plaintiff THAO XIONG is an individual residing in Minneapolis, Minnesota, United States of America. Thao Xiong is an alien, and is not a citizen of the United States of

America. He was born in Royal Laos, and was formerly a citizen of the Kingdom of Laos. Following the process of ending the Vietnam War, he fled Laos and arrived in Thailand, where he obtained refugee status and refugee visa, allowing him to come to the United States. He later obtained, and currently has a permanent resident visa for the United States.

6.   Plaintiff LOR VANG is an individual residing in Milwaukee, Wisconsin, United States of America. Lor Vang is an alien, and is not a citizen of the United States of America. He was born in Royal Laos, and was formerly a citizen of the Kingdom of Laos. Following the process of ending the Vietnam War, he fled Laos and arrived in Thailand, where he obtained refugee status and refugee visa, allowing him to come to the United States. He later obtained, and currently has a permanent resident visa for the United States.

7.   Plaintiff LUE VANG is an individual residing in Fresno, CA, United States of America, within the Eastern District of California. Lue Vang is an alien, and is not a citizen of the United States of America. He was born in Royal Laos, and was formerly a citizen of the Kingdom of Laos. Following the process of ending the Vietnam War, he fled Laos and arrived in Thailand, where he obtained refugee status and refugee visa, allowing him to come to the United States. He later obtained, and currently has a permanent resident visa for the United States.

8.   Defendant LAO PEOPLE'S DEMOCRATIC REPUBLIC [hereinafter after "Laos"] is a country in Southeast Asia.

9.   Laos is sued herein because it conducted a policy to maim and terminate Hmong people. They further expanded the policy to grow into a practice whereby Hmong people were

routinely hunted, killed, raped, mutilated, tortured, poisoning the jungle and their water/food supply.

10. Defendant PRESIDENT THONGLOUN SISOULITHIS is the current President of the Lao People's Democratic Republic. See US CIA country report on Laos, Attached hereto as Exhibit A, listing this defendant's position in the People's Democratic Republic of Laos as of the current time.

11. Defendant SISOULITHIS is sued herein in his individual for conduct he did in the past, and for which he is continuing to commit, pursuant to the power vested in him as President of Laos.

12. Defendant PRIME MINISTER SONXAI SIPHANDON is the current Prime Minister of the Lao People's Democratic Republic. See US CIA country report on Laos, Attached hereto as Exhibit A, listing this defendant's position in the People's Democratic Republic of Laos as of the current time.

13. Defendant SIPHANDON is sued herein in his individual for conduct he did in the past, and for which he is continuing to commit, pursuant to the power vested in him as Prime Minister of Laos.

14. Defendant SOUANSAVAN VI-GNAKET, Minster of Justice is the current Minister of Justice of the Lao People's Democratic Republic. See US CIA country report on Laos, Attached hereto as Exhibit A, listing this defendant's position in the People's Democratic Republic of Laos as of the current time.

15. Defendant Vi-GNAKET is sued herein because of the official program of Laos to commit atrocities against the Hmong people required a legal policy, and justice system, permitting the killing; maiming; torturing; raping; poisoning the Hmong, their jungle, their water supply, and their food supply; and that such conduct against the Hmong people did not constitute a crime under Laotian law. He is sued herein in his individual capacity for conduct he did in the past, and for which he is continuing to commit, pursuant to the power vested in him as Minster of Justice of Laos. The Minister of Justice is the head of the Ministry of Justice, which is the official agency of the country of Laos to administer law and justice in Laos.

16. Defendant GENERAL CHANSAMONE CHANYALATH, MINISTER OF DEFENSE is the current Minister of Defense of the Lao People's Democratic Republic. See US CIA country report on Laos, Attached hereto as Exhibit A, listing this defendant's position in the People's Democratic Republic of Laos as of the current time.

17. Defendant CHANYALATH is sued herein because it is the Minister of Defense carried out the largely military run program against the Hmong people. The Defense Minister is the top official of the military of Laos, and directly participated in carrying out orders to terminate Hmong people, including locating; killing; maiming; torturing; raping; poisoning the Hmong, their jungle, their water supply, and their food supply. He is further is sued herein in his individual for conduct he did in the past, and for which he is continuing to commit, pursuant to the power vested in him as Minister of Defense of Laos.

18. Defendant LIEUTENANT GENERAL VILAY LAKHAMFONG, MINISTER OF PUBLIC SECURITY,  is the current Minister of Public Security of the Lao People's Democratic Republic. See US CIA country report on Laos, Attached hereto as Exhibit A,

listing this defendant's position in the People's Democratic Republic of Laos as of the current time.

19. Defendant LAKHAMFONG is sued herein because of the official program of Laos to commit atrocities against the Hmong people required a legal policy, and justice system, permitting the killing; maiming; torturing; raping; poisoning the Hmong, their jungle, their water supply, and their food supply; and that such conduct against the Hmong people did not constitute a crime under Laotian law. He is also sued herein in his individual capacity for conduct he did in the past, and for which he is continuing to commit, pursuant to the power vested in him as Minister of Public Security. The Minister of Public Security is the head of the Ministry of Public Security, which is the official law enforcement agency of the Laotian Government.

20. Defendant DR. DAO YANG is an individual residing in Inola, Oklahoma, the United States of America and is working at the request of and on behalf of the Lao People's Democratic Republic to spy on Hmong political activities in the United States and to report back to Laos government officials concerning their observations and intelligence collection and gathering efforts.

### III.
### CONDUCT OF DEFENDANTS OCCURRING WITHIN THE TERRITORY OF THE UNITED STATES AND WITHIN THE EASTERN DISTRICT OF CALIFORNIA

A. Information re Hmong Homeland-Related Entities

21. The Plaintiffs' Hmong Country mission was initiated in Fresno in April, 2014. We have members from Fresno, Stockton, Sacramento, California, and across the United States, and consisted of The Hmong Business USA Corporation, Council of Hmong Public

6

Relations, and Hmong State; hmongstate.org. Members came from all walks of life, young, middle age to retirees, widows, professionals so forth.

22. Hmong Business USA Corporation was based in Fresno to develop Hmong Economy in California so that the participant could help the Hmong people in Asia. It has two offices: one in Fresno and one in New York City. Here is the following information from the California Secretary of States's website:

| | |
|---|---|
| *Initial Filing Date* | **06/07/2021** |
| *Status* | **Active** |
| *Standing - SOS* | **Good** |
| *Standing - FTB* | **Good** |
| *Standing - Agent* | **Good** |
| *Standing - VCFCF* | **Good** |
| *Formed In* | **CALIFORNIA** |
| *Entity Type* | **Stock Corporation - CA - General** |
| *Principal Address* | **2350 W SHAW AVE SUITE 123 FRESNO, CA 93711** |
| *Mailing Address* | **4225 OBERON AVE NORTH HIGHLANDS,CA95660** |
| *Statement of Info Due Date* | **06/30/2022** |
| *Agent* | **Individual TXUMUAKOU MOUA 4225 OBERON AVE NORTH HIGHLANDS, CA 95660** |

23. The Council of Hmong Public Relations's website [Council of Hmong Public Relations – The Hmong Center Washington, DC (hmongpr.org)] describes this organization as follows:

"Council of Hmong Public Relations (CHPR) is a non-profit organization that represents the Hmong people around the globe while presenting our ongoing issues to the local, state, or US federal governments, as well as the international community, so the Hmong people can be better served.  The mission is to better the Hmong people in the United States and every corner around the world.  Our agenda includes but not limited to the following committees:

- Advocating for a Hmong Country in Our Ancestral Lands in Asia, Southeast Asia
- Hmong Persecution and Security
- Economics and Agricultural Development
- Advancing Democracy, Human Rights, and Fundamental Freedom
- Culture, Social Affair, and Unity
- Equal Rights and Equal Justice
- Analyzing Domestic, Foreign Affair Policy of the US and Congressional Legislation
- Empowering Hmong Women and Girls
- Kameng Religion and Mengcha
- Pahauh, Leng Kai and Ze Kai

Registered legally as a 501.c.4 non-profit organization in the United States, we largely depend on private, charity, and corporate contributions or donations to sustain our organization and pursue our mission.  As a result, if your organization is working on any

of the above areas or committees, which to better the Hmong people, you may qualify for a grant or loan from CHPR with minimal interest rate"

24. See also press release by the council in the New York Chronicle entitled "Council Of Hmong Public Relations Working Committee For The Initiative Of A Hmong Country" dated September 25, 2023 [www.newyork-chronicle.com/news/story/389883/council-of-hmong-public-relations-working-committee-for-the-initiative-of-a-hmong-country.html]: "The Working Committee will focus on the promotion and preservation of the Hmong religion, Kamen, the dissemination of the Hmong written alphabet, Pahauh, designing the National Flag, promote cultural identity, and pursue the right of self-determination. With the establishment of a new office in New York, the Hmong Nation, in due time, will submit the Hmong Country Application to the United Nations General Assembly, relevant Agencies of the United Nations to become Member State securing its place in the family of nations. As a Member State of the United Nations, the Hmong people and Nation shall honor and fulfill their international obligations, safeguard human rights and maintain international peace and security."

25. With regards to Hmong State, its website states as follows [hmongstate.org]: "Hmong State is a non-profit organization based in the United States that strives hard to protect the Hmong people, who have been prosecuted in Asia continuously since the end of the Vietnam War in May 1975. We peacefully fight against the communist's perpetration, operation, and infiltration in the Hmong communities across the United States and oversea, while seeking a sovereign

state (a country) where the Hmong people can continue to live freely and peacefully like other ancient and indigenous peoples.

The Hmong people declare to be free from the communists' political ideology, philosophy, or propaganda by declaring ourselves to be free from the communists' domination, occupation, persecution, and genocide in our ancestral lands in Asia.

We also reserve the right to be free and independent as we are actively pursuing a self-government that will enable us to continue to expand, sustain, and maintain our unique identity, culture, heritage, and history.

Additionally, we are proud to strictly follow, embrace, and share the United Nation's Charter and Articles in creating peace and security around the globe, as well as its "Transforming our world" Agenda from 2015-2030.

26. The following information about the Hmong State is found on the California Secretary of States's website:

| Initial Filing Date | 09/19/2023 |
|---|---|
| Status | Active |
| Standing - SOS | Good |
| Standing - FTB | Good |
| Standing - Agent | Good |
| Standing - VCFCF | Good |
| Formed In | CALIFORNIA |
| Entity Type | Nonprofit Corporation - CA - Public Benefit |

| | |
|---|---|
| *Principal Address* | **1401 21ST ST STE R SACRAMENTO, CA 95811** |
| *Mailing Address* | **4903 E KINGS CANYON ROAD SUITE 271 FRESNO,CA93727** |
| *Statement of Info Due Date* | **09/30/2025** |
| *Agent* | **1505 Corporation REGISTERED AGENTS INC** |

Its Articles of Incorporation were filed on September 19, 2023; and its Statement of Information was filed on September 26, 2023.

**B. Information re Dr. Yang Dao**

27. Dr. Yang Dao has been working in the capacity of a spy for Lao PDR since at least the period 2007 through to the present, and is expected to continue to work as a spy for the Laos PDR. His work as a spy has taken place and continues to take place in the Fresno, CA area, where many Hmong people live and reside, in the St. Paul Minnesota are, where many Hmong people reside, and in Washington, DC where he reports his information obtained through his spying activities to the Laos PDR government at its embassy in Washington, DC. His spying activities also take place in his current place of residence in Inola, Oklahoma.

28. About the case against Vang Pao and 11 Hmong individuals back in 2007, we are not sure how much or if Dr. Yang Dao played any role. Dr. Yang have many Hmong individuals covertly working for him to infiltrate political organizations and pass it along to the Lao Embassy in Washington as well as US Department of State.

29. Many Hmong organizations, individuals that have connections with Dr. Yang Dao, associate with Dr. Yang Dao, followers of Dr. Yang Dao are all anti our Hmong Country Mission.

30. A summary of internet publications about

1.Wikilinks re Dr. Yang Dao:

www.wikileaks.org/plusd/cables/07VIENTIANE487_a.html

6 pages

Pages of interest

Page 1, summary:

"The politics of the Hmong communities in both Laos and the United States are extremely complex. As a result, a conversation with even a well educated Hmong (or Hmong-American) leader involves exaggeration and guess work and often raises more questions than it provides answers. Nevertheless, a recent conversation with Hmong-American leader Dr. Yang Dao raises several issues that may be worth pursuing. Dr. Yang Dao also asks for police/FBI protection before agreeing to address a Hmong-American gathering in Fresno, California. Since he may be in possession of important, time-sensitive information and seems to be willing to pass a positive message -- that Hmong-American support for attempts to destabilize the Lao Government violates U.S. laws -- the FBI may have interest in contacting him, and the Department may have an interest in supporting the dissemination of this message. Dr. Yang Dao asks the Department to write letters directly to Hmong groups in the United States to repeat this message. Please see our action requests in paragraph 13."

The Wikileaks article shows entries from official United States records as of June 11, 2007.

2. Article from Communist Party of Vietnam online newspaper

https://en.dangcongsan.vn/overseas-vietnamese/overseas-vietnamese-professor-recalls-memories-about-president-ho-chi-minh-597505.html

Pages of interest:

Page 2:

"Prof. Dr. Yang Dao also expressed emotion when recalling the first time he visited Uncle Ho's Mausoleum and, like other Vietnamese far from home, he always remembers Uncle, hoping to have the opportunity to return home every year and visit Uncle Ho's Mausoleum. His family belongs to H'Mong ethnic minority in Meo Vac District, Ha Giang Province. He was the first H'Mong ethnic minority person to receive a doctoral degree in social sciences from the Sorbonne University, France. After that, he and his family moved to live and work in Minnesota, the US.

He taught Southeast Asian anthropology at the University of Minnesota, Minnesota, until retirement. He has always made active contributions in uniting the H'Mong community and the Vietnamese community in order to promote the national cultural identity and connect people with the homeland./.

3. Article from AsianFuse.net

https://asianfuse.net/discuzz/threads/yang-dao.30861/

The article has excerpts of a community chat forum that has content oabout Dr. Yang Dao's status as a Lao spy working in the United States, as seen by the following entry.

Pages of interest: page 3

"tavang **sarNie Juvenile**

he's 100% vietnamese. he's not even hmong. i don't hate him cuz he's viet. i hate him cuz he's working with the laos government and all trying to ruined us hmong peeps and he's a **TRAITOR**!!! he was lucky enough that a hmong family took him in as their child when no one else wanted him and this is what us hmong peeps get? it's just messed up."


4. YouTube Video:

https://youtu.be/GW5lm9PbgRk?si=VSbDa4WQG2UyWOnh

"Dr.Yang Dao Communist Spy receiving a Certificate Award from the Government of Lao PDR in Vientiane"; 10:15 in duration.

Description of YouTube:

The video showed all the Lao and Hmong individuals overseas who worked for the Lao government [names unknown to plaintiffs]. These operatives are working in Fresno, CA and St. Paul, Minnesota, and Washington D.C., and other locations, and continue through to the date of the filing of this complaint to operate as spies for Laos. The persons receiving the awards are not seen making any speeches, only the person that make the video does the talking.

There are two Hmong individuals also appeared on the video. One is George Vue in Fresno, CA and the other one is Chao Lee from the Twin Cities and he is staff member of US Congresswoman Betty McCollum Office. However, the video did not show they receive any awards. We all believed they are the network of Dr. Yang Dao political operatives.

The video was filmed in Vientiane Laos in 11/16/2010.

The video also shows other US-based Laos PDR spy operatives. The names and identities of which are not known to plaintiffs, also receiving recognition for good service.

5. Further Youtubes:

"NEO LAO SANG XAT MEDAL DECORATION TO LAO-OVERSEAS 1.mpeg" on YouTube, https://youtu.be/PoHGsOFIxLM?si=uoQGxizadUc6AoSa

8:43 mins

A summary of this video is as follows:

The video shows defendant Dr. Yang Dao and other Lao PDR USA-based spries receiving awards and recognition for their good service.

6. "Dr. Yang Dao of Neo Lao Sang Xat, Communist Agent"

https://youtu.be/Ihw4TBs6Sqc?si=7WmfGCavkEIiozzF

1:00 min

31. See also Seng Xiong's testimony given 9.23.22 during the merits hearing on his application for protection under the convention against torture before the United States immigration court El Paso Texas hon. Michaels Pleters, judge presiding, pages 39-45.

32. A further incident that occurred within a territory of the United States was the institution of a fake fraudulent criminal action brought by the US Attorney's Office in the Eastern District of California against a group of Hmong individuals including Nia Vang and General Vang Pao entitled *United States v. Harrison Jack, et al*, E.D.Cal., Case No. CR 07-266 FCD. Following a series of court-ordered dismissals of some of the claims, the US Attorney made the decision to dismiss the entirety of the remaining undismissed

charges. Following those events, some of the defendants in that case including plaintiff Nhia Vang filed a malicious prosecution case against the United States of America by conduct of its undercover operator Stephen Decker of the ATFE, for knowingly prosecuting a complaint that was based on a pack of lies.

33. That civil malicious prosecution case was dismissed by the trial court in the Eastern District of California upon findings at the US Attorney's decision to dismiss the underlying criminal case did not reflect on the substantive merits of whether the defendants were in fact guilty or not, but was done instead for other policy and related issues.

34. In the malicious prosecution case, the case was dismissed early on and appealed to the Ninth Circuit Court of Appeals, which reversed the dismissal and remanded it to the trial court for further proceedings. On remand, the trial court issued an order dated August 20, 2015, instructing the US Attorney's office to give a statement as to why it dismissed the action, and if that dismissal was based on the substantive merits showing that the plaintiffs in the malicious prosecution case were actually innocent of the charges, or were dismissed due to other non-substantive issues.

The Order states at page 2, lines 18-21:

"Therefore, IT IS HEREBY ORDERED that, within fourteen (14) days of the date this Order is electronically filed, Defendants shall file a brief addressing whether the charges against Plaintiffs were withdrawn on the basis of a compromise among the parties or for a cause that was not inconsistent with Plaintiffs' guilt."

35. The United States/Defendants did submit a brief, a copy of which is attached hereto as Exhibit B. The brief states at Page 2, lines 6-10:

"On August 20, 2015, this Court, pursuant to the Ninth Circuit's instructions on remand, ordered Defendants to address whether the charges in the underlying criminal prosecution, *United States v. Harrison Jack, et al*, E.D. Cal., Case No. CR 07-266 FCD ("*Jack*"), were withdrawn on the basis of a compromise among the parties or for a cause that was not inconsistent with Plaintiffs' guilt.[2] Dkt. No. 48."

36. The Government's brief [Exhibit B] goes on to state at Page 2, lines 11-14:

"As demonstrated in the accompanying declaration of United States Attorney Benjamin B. Wagner ("Wagner Decl."), despite probable cause and evidence that Nhia Kao Vang, David Vang and Chue Hue Vang (the "Vang Plaintiffs")[3] committed the remaining crimes with which they were charged, the United States dismissed the *Jack* prosecution based on factors unrelated to the merits. Through its rulings and comments, the court revealed a remarkable hostility to the government's case. *See* Wagner Decl., ¶ 4. The criminal defendants also alleged agent and prosecutorial misconduct, raising a risk of a negative credibility finding and suppression of evidence. *See id*. at ¶ 5-6. Going forward, the case would require a significant number of personnel, trial would be fiercely contested and any sentences imposed would likely be low. *See id*. at ¶ 7-8. As a result, U.S. Attorney Wagner weighed the costs and benefits of pursuing the case, and determined that no substantial federal interest was served by continued prosecution. *See id*.at ¶ 3, 9. None of these reasons for dismissal, however, are inconsistent with the guilt of the Vang Plaintiffs. Accordingly, Plaintiffs cannot maintain a claim for malicious prosecution."

37. The government explained its contention that the underlying criminal case was not

dismissed as follows [Exhibit B, Page 3, lines 7- page 4, line 6]:

"In December, 2010, after three years of litigation, U.S. Attorney Wagner recommended

dismissal of the *Jack* prosecution to the United States Department of Justice's National

Security Division ("NSD") because, given the circumstances, no substantial federal

interest would be served by continued prosecution. *See* Declaration of Benjamin B.

Wagner ("Wagner Decl."), ¶ 3. U.S. Attorney Wagner made this recommendation, as a

discretionary matter, for a combination reasons, including the following. *Id.*

First, the court made a series of adverse rulings, vigorously opposed by the United States,

suggesting it was markedly hostile to the government's case. *See* Wagner Decl., ¶ 4. At

the same time, the court gave defendants extraordinary leeway in litigating the case. *Id.*"

Second, the criminal defendants alleged the wiretap, search warrant and complaint

affidavits submitted by the undercover agent contained incriminating statements falsely

attributed to former defendant General Vang Pao, and failed to disclose certain facts. *See*

Wagner Decl., ¶ 5. Although U.S. Attorney Wagner believed the agent acted in good

faith, he had never testified in a contested court hearing or trial. *Id*. The upcoming *Franks*

hearing raised the possibility that the agent would be subject to vigorous cross-

examination regarding his alleged errors, the criminal defendants would suggest he was

unreliable among other things, and the court would enter a negative credibility finding,

especially given its previous expressed views about the case. *Id*. Because this agent was a

critical prosecution witness, such a finding would be damaging beyond its impact on the

pretrial motions. *Id*.

Third, the criminal defendants alleged that the prosecutors engaged in misconduct. *See*

Wagner Decl. at ¶ 6. Although U.S. Attorney Wagner believed that all personnel acted in

good faith, prosecutors and agents inadvertently committed a technical violation of the

60-day search warrant deadline relating to computer searches. *Id*. This inadvertent error created a risk of suppression. *Id*.

Fourth, the United States faced a fiercely contested trial and considerable litigation on evidentiary issues. *See* Wagner Decl. at ¶ 7.

Fifth, even if the United States prevailed, the court was likely to impose minimal sentences. *See* Wagner Decl. at ¶ 8.

Finally, taking all of these factors into consideration. U.S. Attorney Wagner performed a cost/benefit analysis."

38. The Government concluded as follows [Exhibit B, Page 6, lines 13-21]:

"As demonstrated by U.S. Attorney Wagner's declaration, the United Stated did not dismiss the *Jack* prosecution because the remaining charges against the Vang Plaintiffs lacked merit. The United States had evidence that the Vang Plaintiffs had committed the remaining crimes with which they were charged, and made no compromise to dismiss them. *See* Wagner Decl., ¶ 11, 12. Instead, it ended the prosecution because the costs of pursuing the *Jack* case outweighed the benefits. *Id*. at ¶ 3-9, *see also Deal v. Alegre*, 2006 WL 436144 at *4 (N.D. Cal. Feb. 21, 2006) (a dismissal in the interests of justice was not inconsistent with guilt where an essential witness was unavailable, the accused had served his sentence and had a prior conviction). Accordingly, the dismissal was not inconsistent with the Vang Plaintiffs' guilt, and as a result, Plaintiffs cannot maintain a malicious prosecution action."

39. The true facts were stated and described in the Appellants Vang et al.'s Appellants' Openign Brief to the US Court of Appeals for the Ninth Circuit, Appeal No. 16-15443, excerpts of which are attached hereto as Exhibit C.

19

*Xiong et al. v. Laos et al.*
COMPLAINT FOR DAMAGES UNDER THE ALIEN TORT CLAIMS ACT; INJUNCTIVE RELIEF; DECLARATORY RELIEF;
ATTORNEYS FEES; REQUEST FOR JURY TRIAL

40. The point of showing all of these deceits lies and trickeries in the federal prosecution of a group of defendants, including General Pao, is that it all came from Lao People's Democratic Republic spies operating in the eastern district of California to bring down any Hmong person that was associated with the US secret war in Laos. All of the defendants in that case had family members directly involved in the secret war against Laos. For example, Nhia Vang's father was employed by the USA-CIA and died fighting for the USA.

41. The USA government turned on all these people based on a bunch of lies told to them by Laotian spies, and brought a bogus prosecution against all of them, which they later had to abandon under a bunch of false claims that it was based on the interest of justice. In fact, it was based on the fact that there was no evidence to support the crimes alleged, and they had to dismiss the criminal case based on lack of evidence. The evidence was that US government officials ask Hmong people to get involved in a war against Laos, and then turned around and charged those among people with unlawful waging of a war against a friendly country.

42. The facts of that case are shown here to give another example of conduct of the Lao People's Democratic Republic in their campaign against Hmong people that occurred inside the territory of the United States of America, thus invoking jurisdiction of the United States courts over the Alien Tort Claims Act claims asserted herein.

43. The Ninth Circuit Court of Appeals affirmed the trial court's dismissal of the malicious prosecution action, notwithstanding the obviously material issues of fact regarding what really happened. Instead, both the trial court and the Court of Appeals loyally accepted as

100% true everything that the US Attorney's Office stated about its dismissal of the underlying criminal action.

44. The falsity of the wire fraud and mail fraud claims brought in the criminal case against plaintiff Seng Xiong, also described in the first claim for relief below, are further shown by the fact that there was actually not a single victim witness that was brought forward during the trial of the action. The only person who came forward was actually Souk Thao, the son of an alleged victim, and a California state police officer. His father, Sao Thao, was a donor to the Hmong homeland program. Souk Thao, the son who testified, was not a donor and was thus not a direct victim.

45. Souk Thao testified that he worked in Riverside County, and his father, donor Sao Thao resides in Cherry Valley, Riverside County, CA.

46. To further show the falsity of that claim the US attorney took approximately $1.2 million in funds from a bank account that was collected-up from donors who were attempting to fund the process of buying land to create a Hmong homeland.

47. Plaintiff's counsel obtained a series of 121 declarations from these so-called victims, in which they made it clear under oath that they were not victims at all, and that they provided money to bring forward a Hmong homeland. An exemplar declaration of one of these witnesses, Cher Pao Xiong, is attached to this complaint as Exhibit D. The following is a list of all of the witnesses of people the US Attorney refer to as victims, who in fact were not victims at all:

1. Shue Xiong, 2. Nao H. Xiong, 3. Lao Thao, 4. Cheng Xiong, 5. Chue Ge Vang, 6. Vue Lee, 7. Gacheng Yang, 8. Waseng Xiong, 9. Zong Kai Xiong, 10. TK Lee, 11. Sao Thao, 12. George Yang, 13. Wayer Moua, 14. Kao Lee, 15. Koua Moua, 16. Ter Yang, 17. Zong Koua Moua, 18. Youa Doua Yang, 19. Lee Her, 20. Sia Xiong, 21. Chai Thao, 22. Cher Pao Xiong, 22. Ger Vang, 23. Gee Vang Lor, 24. Wilson Vang, 25. Kai Vang, 26. Cha Moua Vang, 27. Charz Sang Xiong and Bee Yang, 28. Thongdy Vang, 29. Yer Xiong, 30. Vamdernt Lee, 31. Vue S. Vang, 32. Chao Lee, 33. Chang Pao Xiong, 34. Cher Thao, 35. Nhia Xiong Yang, 36. Yao L. Thao, 37. Fai Lao Vang, 38. Chad Thao, 39. Cher Pao Vang, 40. Nancy Lee, 41. Ger Vang, 42. Boua Vang, 43. Ye Vang, 44. Youa Vang, 45. Lee Pao Xiong, 46. Willy Vanh, 47. Cha Ye Xiong, 48. Lee Kue, 49. Nhia X. Lee, 50. Kia Lee, 51. Chongchee C. Wange, 52. Leng Chang, 53. Cheng Chang, 54. Brong Lor, 55. Fong Moua, 56. Richard Lee, 57. Toua Xiong, 58. Pa Zao Her, 59. Mai Nhia Lee, 60. Nhia Chao Her, 61. Bee Lor, 62. Chang Vang and Chia Neng Vang, 63. Poua Yang Thao, 64. Chang Yang and Pang Xiong Yang, 65. Fu Jay Yang, 66. Vong Houa Xiong, 67. Cher Thao and Nhia Xiong Yang, 68. Koua Khang, 69. Zoua Xiong, 70. Songher Her, 71.Wa Seng Her, 72. Wechai Moua, 73. Thao Xiong, 74. Peter Z. Thao, 75. Houa Thao and Xia Yang, 76. Bobby Joe Yang, 77. Yia Yang, 78. Hue Yang, 79. Chiato, 80. Yur Yang, 81. Charles Cheu Yang, 82. Cheryong Thao, 83. Boua Lee Lor, 84. Sang Moua, 85. Wilson C. Vang, 86.Sai Her Xiong, 87. Ka C. Xiong, 88. Chong Veng Moua, 89. Tomsing Her, 90. Khua Jer Vang, 91. Yayoashi Her, 92. Ngia Her, 93. Youa Pao Hang, 94. Shong Xiong, 95. Kou Xiong, 96. Pengsue Lee, 97. Ge Lee, 98. Charles

Xiong and Melinda Xiong, 99. Der Xiong, 100. Thong Lee, 101. Harry Xai Lee, 102. Bee Yang, 103. Der Xiong, 104. Frederic Vang, 105. Helene Vang, 106. Jong Lue Yang, 107. Ka Vang, 108. Koua Xiong, 109. Mai H. Vang, 110. Pao Ge Xiong, 111. Parher Yang, 112. Peter Lee, 113. Sor Vang, 114.Thai Sau Ly and A Seng Thao, 115. Xe Lor, and 116. Zong Paul Vang, 117. Nhia Xiong Thao, 118. WaChore Yang and Shong Vang; 119. Lee Pao Vang, 120. Houa Xiong, and 121. Sao Thao.

48. The statement set forth in Exhibit D include the following statement of facts:

"2. I recently received a check from the United States government purporting to be restitution as a result of the USA's case against Seng Xiong [United States District Court, District of Minnesota Case No. 16-CR-167(SRN)] from the funds collected by Hmong Tebchaws. I wish to return these funds back to the USA and with instructions to keep all those funds together so that Hmong Tebchaws may use those monies to purchase lands to be arranged for hopefully in Thailand, but somewhere on this Earth that we will then call a Hmong homeland.

3. I am not a victim of any sort in this case. At no time did I believe or ever say that Seng Xiong somehow tricked or defrauded me."

49. The list of 121 donors to the Hmong country campaign describe above include a substantial number of donors [at least 9 out of the 121] that came from Fresno and other locations within the Eastern district of California.

50. A further falsity uncovered by plaintiff council is the bizarre fact that the US Attorney having committed its own fraudulent conduct in seizing the bank account of the Hmong country effort, failed to actually pay it back to the donors. We have collected up 60 declarations by donors who never got their money back/all of their money back. Attached hereto as Exhibit E is an exemplar statement made by donor Pao Xiong, who states therein:

"I, Pao Xiong, had contributed to Mr. Seng Xiong prior to his arrest in March 2016 in the amount indicated below. While the Court would not return my contribution to Mr. Xiong, I request that it be sent to me so I can do whatever I want with the fund.

Total amount of contribution to Mr. Seng Xiong        $1,855.00

Total amount I have received from the Court/DOJ        $560.00

The amount of restitution to be sent back to me        $1,295.00"

51. The following list of individuals are donors who put money in that was taken in the prosecution of Mr. Seng Xiong, and kept in trust by the US attorney, and never returned back to these donors:

1.  America Vang
2.  Boua Lee Lor
3.  Brandy Xiong
4.  Cha Her
5.  Cha Moua Vang
6.  Cha Vang
7.  Cha Xue Lee
8.  Chang Chai Vang
9.  Chao Lor
10. Chao Vang
11. Charles Xiong
12. Charlie Xiong
13. Cheng Xiong
14. Cher Pao Vang
15. Chong Sao Vang

16. Chong Vang
17. Fai Lao Vang
18. Francois Vang
19. Harry X. Lee
20. Her Pao Vang
21. Jeff P. Xiong
22. John T. Xiong
23. Jong Lue Yang
24. Ka Vang
25. Khaisu Xiong
26. Kue Lee
27. Lee Pao Xiong
28. Lor Vang
29. Lou Tou Yang
30. Luc Ya
31. Maiyia Xiong
32. Mee Lor
33. Nao Chu Heu
34. Nao Hue Xiong
35. Neng Xiong
36. Neng Yang
37. Nhia X Lee
38. Nou C. Yang
39. Pao Xiong
40. Pao Xiong
41. Phia Yang
42. Prentice H. Vaj
43. Sai Her Xiong
44. Sao Thao
45. Seeh Xiong
46. Shoualou Yang
47. Sia Xiong
48. Sor Vang
49. Soua Xa Yang
50. Tong Pao Lee
51. Toua Lee
52. Toua Xiong
53. Tria Xiong
54. Vang Yang
55. Victor J. Xiong
56. Wilson C. Vang
57. Xao L Thao
58. Yang Her
59. Youa Vang
60. Zong Paul Vang

52. The list of 60 donors to the Hmong country campaign who provided declarations described above indicating that they had not received the restitution payment, include substantial number of donors [10 out of 60] from Fresno, CA and other locations within the Eastern District of California.

53. Due to the federal criminal law process in limitations on post judgment relief, the issues regarding the total lack and absence of a real victim in the case never got heard on their merits, and instead were summarily rejected based on a failure to raise them on the first round of post-judgment challenges. The issues about the restitution and the collection up of funds the amount of the restitution, and whether or not the amount was properly distributed or not, likewise never got to see the light of day due to restrictions on challenging restitutionary judgments.

54. Because of those restrictions under federal law, not only could Seng Xiong not challenge the lack of an actual recipient victim witness giving testimony against Seng Xiong (literally zero were brought forward by the US attorney), and the notion that the so-called victims were not victims at all, never considered themselves victims, and were instead earnest donors in hopes of creating a collective fund sufficient enough to buy a piece of land somewhere to be a Hmong homeland was never able to be litigated either on the merits in the trial court and/or in any appellate procedure. It remained buried under federal criminal law procedure that limits defendants' ability to challenge convictions to basically one shot at that, and these issues were not raised in that one shot. As a result, these issues were never litigated on the merits and never saw the light of day. They are

thus asserted here as claims that have not been decided on the merits, and should be placed here at issue on the issue of the court's jurisdiction to permit and authorize this Alien Tort Claims Act based on activities of Lao PDR spies creating these bizarre criminal cases that were done in an entirely fraudulent and false manner based on false information provided by Lao PDR spies acting in the United States.

55. The falsities embedded into the criminal prosecutions that occurred in Sacramento and in Minnesota are flagrant, eminently, provable and show the impact of the behavior of the Lao PDR spies operating inside the territory of the United States of America.

56. In addition to Defendant Yang Dao, Plaintiffs are aware of the names of at least two others such Lao PDR spy operatives working inside the territory of the United States to collect information concerning Hmong political activities and reporting that information back to Laos PDR officials: George Vue, and Dr. Sam Thao.

57. These Laos PDR directed spying activities in the USA occur at a substantial level in Fresno, California and other locations within the Eastern District of California.

58. In Seng Xiong's criminal case in Minnesota, Defendant Dr. Yang Dao had publicly warned Seng Xiong and his group that they must stop and cease any activities in the pursuit of a Hmong Country because there is no laws allowing the Hmong People to have a Country. Dr. Dao further said and told the US government, US Prosecutor's Office, St. Paul Police Officers, and US Secret Service that there is no place, no land left anywhere in Southeast Asia or Asia for Hmong to have a country. Therefore, he argued that Seng

Xiong's mission to establish a Hmong Country is fraudulent, and those supporting the Mission by voluntary donating money to the Mission are victims.

59. All these things are untrue and lies given by Dr. Yang Dao. Furthermore, Dr. Yang Dao had lobbied Steve Moua (a key witness in the criminal) to work and cooperate with him.

60. One of other things that the US Prosecutor in Minnesota told Seng Xiong's lawyer Allan Chaplain that the real reason the US government decided to arrest Seng Xiong was that he sold 10 acres of land in a foreign country, which is a lie told to US Prosecutor Office by Hmong Attorney Sia Lor in Minnesota.

61. Dr. Yang Dao has thus recruited many Hmong intellectuals, Veterans of the old NeoHom people, General Vang Pao's sons to work with him to stop Seng Xiong's mission.

62. A reasonable inference of the facts in light of what we know about what they did in the Minnesota case against you is that it was the result of Laos PDR spy operatives in the USA working with USA law enforcement to bring about false claims and false charges against politically-active Hmong individuals.

**IV.**
**EVIDENCE AND FACTS REGARDING THE SYSTEMATIC CAMPAIGN BY THE LAO PEOPLE'S DEMOCRATIC REPUBLIC AND ITS TOP OFFICIALS TO COMMIT A GENOCIDAL CAMPAIGN TO ELIMINATE HMONG PEOPLE WHOSE FAMILIES WERE CONNECTED TO THE USA SECRET WAR IN LAOS; AND TO COMMIT WAR CRIMES INCLUDING VIOLATION OF A PEACE TREATY, AND COMMISSION OF MULTIPLE ACTS OF TORTURE, MURDER, RAPE, AND DISEMBOWELMENT OF HMONG PEOPLE**

63. Plaintiffs cite the following evidence to show the undeniable fact that since approximately 1972, up and through to and the present and continuing, the Lao People's Democratic Republic, following the 1973 Peace treaty that ended the Vietnam War, has instead of conducting a peaceful country, decided to engage in a genocidal campaign against Hmong people whose family members were associated with the USA "secret war" in Laos. Laos has committed a genocide against Hmong people that still continues to this day; it has violated the peace treaties and has committed a series of war crimes including the massacre *en masse* of Hmong people living in the jungles of Laos; the sexual assault and rape of women in Loas; and the torture, mutilation, and disembowelment of Hmong people in Laos.

64. As part and parcel of that generalized campaign, Laos has also combatted any effort by the Hmong people to escape loud and/or to establish their own safety areas, including a Hmong homeland.

65. Each of the plaintiffs in this action have family members that were associated with and worked with the US CIA's secret war in Laos by having family members serve as soldiers in that secret war. As a consequence of that family involvement, the plaintiffs' immediate family members have been murdered and eliminated by Laos.

66. The Plaintiffs themselves have been forced to flee Laos, as they cannot have any kind of life there. The plaintiffs were born in Laos, and were citizens of the Royal Laos Nation, but are people to be simply tortured and eliminated to the Lao PDR. Each of the plaintiffs in this action are individuals who have worked toward a project in the USA to establish a homeland for Hmong people in some location on this world, and as such have a reasonable expectation of economic and security benefit from the establishment of a Hmong country somewhere. That country could exist if things got organized in Laos, but right now there's no way Hmong people can do anything of the sort in Laos. That Hmong homeland could exist in Thailand, where some of the lands that used to belong to Laos were ceded over to Thailand in the northern parts of Thailand and could be turned into Hmong country land. That land could also be created with the agreement of the Philippine government in the country of Philippines. That land for Hmong people could also be established in the United States, if the United States were agreeable and could create homeland for Hmong people, in a similar way that the USA has created sovereign lands for the Native American populations.

67. Laos, however, has stopped the progress of the Hmong Homeland campaign by putting spies in the USA to report on Hmong Homeland political activity and other political activity which plaintiffs have been directly involved in. As a result of the USA-based spies, the Homeland campaign has been deeply disturbed, delayed, and trampled, but is by no means over.

68. Plaintiffs are still currently engaged in the establishment of a Hmong homeland, and will suffer irreparable harm unless some form of injunctive relief requiring Laos to stop the atrocities they are committing against the Hmong people and against plaintiffs in this

1   action, and to stop the campaign against the establishment of Hmong homeland, and/or

2   such other injective relief as the Court deems just and appropriate, is granted.

3

4   69. Here are the facts and evidence of the atrocities committed by Laos officials including the

5   defendants sued individually in this action.

6

**Series of News Obtained by Plaintiffs Discussing the Atrocities Committed by the Laos Officials, including the Individual Defendants Sued in this Matter**

70. Plaintiffs have collected up a series of press articles published online, which include the

following titles and quotations from the articles. Each of these articles show the

undeniable truth that the Laos government, including the individuals sued herein, are

guilty of committing these terrible atrocities against the Hmong people:

1. "Amnesty International Says Lao Soldiers Killed and Mutilated Hmong Children -

2004-09-14", October 29, 2009 [www.voanews.com/a/a-13-a-2004-09-14-6-amnesty-

67363002/382447.html], page 2: "Human rights groups accuse the government and

military of abuses against the ethnic Hmong, committed as the government tries to

wipe out the rebels."

2. "Hmong: New Deadly Attack Launched by Laotian Military", May 12, 2020

[unpo.org/article/21883], page 2: "The attack is just the latest episode of a series of

gross violations committed against the Hmong people. Such violations include

uncompensated land confiscation, arbitrary arrests and killings, enforced

disappearances, suppression of freedom of expression and severe restrictions on the

Hmong's economic, social and cultural rights. In light of overwhelming evidence that

the Lao People's Revolutionary Party (LPRP) has violated the most basic human

rights of the ChaoFa Hmong, the UNPO calls on the UN to launch an immediate

investigation of human rights violations in the region."

3.  Radio Free Asia, *Lao troops told 'shoot to kill' Hmong rebels,* 8 February 2008,

available at: https://www.refworld.org/docid/47b5b70828.html [accessed 7 July

2022], Page 1: "Government troops in Laos have been ordered to shoot to kill ethnic

Hmong insurgents in the country's northern jungle regions, with cash rewards offered

for every "enemy" killed, RFA's Lao service reports. A military official in the

northern province of Luangprabang said the orders had now become an "open secret"

in Laos. The orders apply to the region extending from lower Luangprabang to

Xiengkkhouang and the northern part of Vientiane province, where the government

hopes systematically to break up Hmong opposition groups by force."

4.  "Laos: Attacks Intensify Against Lao, Hmong People", March 4, 2013

[www.businesswire.com/news/home/20130304006755/en/Laos-Attacks-Intensify-

Against-Lao-Hmong-People], page 1: ""There is a major surge in political violence

and ethnic and religious persecution in Laos following the arrest of Lao civic activist

Sombath Somphone and the disappearance of three Lao-American men from

Minnesota who traveled recently to Laos," said Philip Smith, Executive Director of

the Washington, D.C.-based CPPA."

5.  Ounkeo Souksavanh, Max Avery, and Richard Finney, "Lao Government Troops

Launch New Assault Against Hmong at Phou Bia Mountain", Radio Free Asia, April

4, 2021 [www.rfa.org/english/news/laos/assault-04012021160502.html, page 2: "The

new push against the Hmong-who fought under U.S. advisors against communist

forces during the Vietnam War-follows the March 14 publication of an order by

authorities in Xaysomboun province barring access by civilians to the forests near

Phou Bia, the highest mountain in Laos, an international NGO said at the weekend.

Hmong civilians living in the area are now reporting an increase in violence at the

hands of government troops, an official of the Brussels-based Unrepresented Nations

and Peoples Organization (UNPO) told RFA in an email on March 28.

*** 

The Lao military has long pushed a campaign targeting Hmong in the region in a

program of military attacks and forced relocations into government-controlled

camps and villages, with repression and the use of force entering "a new phase of

severity" in 2016, the UNPO said in a March 25 statement urging an international

response to the crisis.

***

Authorities in multi-ethnic Laos have long been wary of opposition among the

country's Hmong ethnic minority, many of whom say they face persecution from the

government because of their U.S. ties during the Vietnam War, when thousands of

Hmong fought under CIA advisors during the so-called Secret War against

communists in Laos."

6. Samuel Pitchford, "The Forgotten Genocide: Hmong And Montagnards

Face Violent Religious Persecution", Human Rights Pulse, October 14,

2021 [www.humanrightspulse.com/mastercontentblog/the-forgotten-

genocide-hmong-and-montagnards-face-violent-religious-persecution,

page 2:

"Around 300,000 [Hmong] fled to neighbouring Thailand where they were placed in squalid detention camps: Thailand is not a party to the 1951 Convention Relating to the Status of Refugees and so does not recognise the Hmong as refugees. Many were later resettled in the United States, but Thailand has deported many back to Laos (to an uncertain future).

Those unable to escape Laos fled into the jungles. Since 1975, reports of Laotian military attacks on the Hmong have filtered out of the country (here, here, and here). The latest reported attack was in April 2021. There is also evidence of chemical weapons attacks against Hmong civilians. In Vietnam, Hmong and Montagnards persecution is less severe. Nevertheless, Hmong and Montagnards face arbitrary detention, beatings, and evictions. Priests, pastors, preachers are often targeted."

7.  "UN warns Laos over persecution of Hmong" Union of Catholic Asian News, July 2, 2021 [www.ucanews.com/news/un-warns-laos-over-persecution-of-hmong/93115], page 2:

"The special rapporteurs also voiced their concerns over allegations that the Lao army has carried out indiscriminate military attacks on Hmong communities in the area and perpetrated a variety of human rights abuses, including extrajudicial killings.

Hmong people in the area belong to an independence movement that has resisted the communist takeover of Laos since 1975 and as a result continue to be routinely victimized by the country's regime.

"We are distressed by credible allegations and testimonies indicating that cases of extrajudicial killings, torture and other serious violations of human rights, including sexual abuse, have been perpetrated by army soldiers," the signatories said.

"[These allegations] seem to be part of an ongoing and escalating pattern of violence by government forces characterized by a disproportionate use of force, against Hmong individuals "and communities, including elderly [people], women and children.""

71. Series of Declarations Obtained by Plaintiffs Discussing the Atrocities Committed by the Laos Officials, including the Individual Defendants Sued in this Matter

72. Plaintiff has accumulated 68 declarations of various Hmong people who have signed declarations under oath and under penalty of perjury attesting to the basic facts that they have personally observed and come to know concerning Laos's campaign of atrocities against the Hmong people in Laos. The following are the names of the eyewitnesses for whom we have declarations:

1. Shue Xiong [and Supplemental Declaration of Shue Xiong]

2. Brandy Xiong

3. Frederic Vang

4. Helene Vang

5. Cha Lor

6. Cher Pao Xiong

7. Peter Lee

8. Tou Cha Her

9. Blia Xiong

10. Anyx Nhia Chou Vang

11. Bla Vang

35

*Xiong et al. v. Laos et al.*
COMPLAINT FOR DAMAGES UNDER THE ALIEN TORT CLAIMS ACT; INJUNCTIVE RELIEF; DECLARATORY RELIEF;
ATTORNEYS FEES; REQUEST FOR JURY TRIAL

12. Charles Cheu Yang

13. Chayee Xiong

14. Cher Pao Vang

15. Chia Moua Vang

16. Coley Tang Vang

17. Ka Vang

18. Kamai Yang

19. Koua Xiong

20. Pang Xiong

21. Kia Lor

22. Kou Yang

23. Lee Kue

24. Plia Khang Yang

25. Prentice Vaj

26. Seng Xiong

27. Shoua Moua

28. Stephen Shong Thai Lee

29. Thao Vang

30. Thao Xiong

31. Wa Tong Moua

32. Wilson Vang

33. Xao L. Thao

34. Zong Vue Lee

35. Yia Vang Xiong

36. Yang Vang Lee

37. Bee C. Lor

38. Ka Kong

39. Mee Yang

40. Her Nao Chu

41. See Vang

42. Jee Lee

43. Waseng Xiong

44. Ye Vang

45. Ka Lor

46. Mee Lor

47. America Vang

48. Keiserma Xavang

49. Tong Ku Xiong

50. Toua Tony Lee

51. Her Tru Ly

52. Va Vang

53. Victor Yang

54. Sandy Her

55. Wa Lue Xiong

*Xiong et al. v. Laos et al.*
COMPLAINT FOR DAMAGES UNDER THE ALIEN TORT CLAIMS ACT; INJUNCTIVE RELIEF; DECLARATORY RELIEF;
ATTORNEYS FEES; REQUEST FOR JURY TRIAL

56. Washoua Moua

57. Wilson C. Vang – Check if duplicate

58. Xia Fong Yang

59. Zong Vue Lee

60. Chang Vang

61. Xeng Xiong

62. Yong Yia Yang

63. Zamua Lee

64. Houa Xiong

65. Lor Lee

66. Sheng Ya Lee

67. Her Ngia"

73. We have not submitted these actual declarations to this complaint but instead will summarize them here and will give direct quotations from those decorations. The declarations themselves comprise 157 pages and are retained and kept by plaintiffs' counsel.

74. The list of 67 witnesses to the specification of the atrocities committed by the Laos PDR and Laos officials previously in charge of Laos and the Laos officials that are continuing that program and who are sued herein as defendants include a substantial number of

witnesses [12 out of 67] who provided declarations that are currently from Fresno

California and other cities within the Eastern district of California.

75. A description of some of the declarations are as follows:
   1.  Declaration of Shue Xiong

The declaration of Mr. Shue Xiong includes a series of recent photos from an incident of

March 9, 2021 attached as Exhibits A, B and C to his declaration. These photos show

examples of incidents where Laos communist military officials captured a Hmong man

named Chue Youa Vang, tied him to a tree, beat, tortured, and later beheaded him.

Shue's declarations and photographs are corroborated by the Government's evidence,

Report by the US State Department, which gives the following description of the same

incident:

> "In April several UN special rapporteurs wrote a letter to the government
>
> expressing concern about the alleged March 8 killing of Chue Youa Vang, a
>
> relative of two ethnic Hmong victims from a group of four Hmong who
>
> disappeared in March 2020. The letter alleged Vang was shot and killed by
>
> soldiers as reprisal for his and other family members' advocacy for their missing
>
> relatives."

2.  Supplemental Declaration of Shue Xiong

Shue Xiong's declaration includes as Exhibit B thereto photos of a 2006 incident in

which Laos military officials murdered Hmong people (four photos).

39

Exhibit C to his supplemental declaration is a collection of photos obtained on the internet by doing the following search: Hmong people killed by Laos Military.

3. Declaration of Brandy Xiong

The Declaration of Brandy Xiong states in part:

"2. As a Hmong person born in Laos, I was never treated as or considered to be a citizen of Laos. For example, I was never given any kind of national identification card, birth certificate, or a passport. I was never allowed or permitted to be involved in any kind of public or civic affairs. We were allowed to live there, but were never treated as or considered to be nationals of Laos.

3. After the Vietnam War ended (1975), the current Communist regime took over Laos, and is still in charge of Laos.

4. The current Communist regime has and continues to be extremely hateful towards Hmong people, because the Hmong people were asked by the USA CIA to become USA soldiers in the USA secret war in Laos. After the peace treaties of 1971/1972 were signed, the USA pulled out of Southeast Asia in 1975.

The Laos Communist regime then used its military defense forces to hunt down Hmong people living in the hills and jungles of Laos, and systematically raped Hmong women and young girls (as young as 10) while torturing and killing the Hmong people of all ages due to their alliance with the USA CIA secret war in Laos from 1959 to 1975. The genocide of the Hmong people started from 1975 until today (2022)."

Brandy Xiong also attached her own five-page statement on the history of abuse by Laos military official against Hmong people, which includes the following statements of interest here:

"...when Thailand and the United States withdrew their troops, the Hmong nation suffered from persecution, racial discrimination, genocide, torture and labelled as the enemy of Pathet Lao (LPDR) and North Vietnam because of the loss of thousands of lives and countless action that were perpetrated by Thailand and the United States both in Laos and Vietnam during the Vietnam war era from 1960 to 1975. The Lao (LPDR) has shown history of arbitrary arrests and disappearances, such as imprisonment, torture and execution.

(4. Whereas the violent military campaign of Lao ( LPDR) against Hmong indigenous, who refused to flee the country or surrender to the government for fear of arrest, torture and execution that began in 1975, more that 70,000 of Hmong indigenous men, women and children out of more than 100,000 Hmong indigenous were forced from their villages to the rainforest, which is so called Xaisomboun Special Zone, Northern Laos.

(5. Whereas this campaign is still ongoing and the Hmong indigenous a continue to be

      hunted by the Lao (LPDR) military and North Vietnam mercenaries, and now the

      Hmong indigenous were utterly wiped out from the rainforest due to starvation

      and were killed by the Lao (LPDR) and North Vietnam mercenaries. Be advised

      that the Hmong's problem is also the United States problem. Whereas the Hmong

      people had defended democracy and freedom for the entire World for 15 years.

      Whereas the Hmong had made history for the entire World to enjoy peace,

      democracy, security and well-being for almost 50 years now.

***

(11. Whereas the Hmong were admitted to the United States as refugees and rights under the Refugees Program of the United States and United Nations, not economic immigrants. Whereas the Hmong fled Laos to Thailand and many other countries from persecution, torture and genocide. Whereas the Hmong people are not safe to repatriate back to Laos, if they return to Laos they will face execution and torture. Whereas the Hmong people were not citizens of Laos, the Hmong never have been recognized as citizens of Laos by the Lao government from the very beginning.

(12. Whereas of 05/20/1979 I have witnessed and saw with my own eyes that around 3,000 Hmong men, women and children had been killed by Lao (LPDR) soldiers and North Vietnam mercenaries in Phou Bia mountain, which was located in Xaysomboun

Special Zone in Northern part of Laos. Their bodies were bloated, bubbling with tongues sticking out and eyes were popping out when their bodies started rotting. As of 06/15/1981 I had witnessed that 160 Hmong men, women and children had been taken out from the village of Than Xay in the of XaySomboun and the Province of Vientieng, Laos to the jungle with blindfolded, their hands were tied behind their backs, once they arrived to the jungle their bodies had been struck by sticks and stones from behind. As of 2008 Trillion Yang and Hakit Yang, Hmong men from Saint Paul, Minnesota disappeared in Laos during their trip to Laos .. Half million Hmong people had been killed by Lao soldiers since 1975 to this day."

4.  Declaration of Frederic Vang

42

His Declaration states in part:

"4. The current Communist regime has and continues to be extremely hateful towards Hmong people, because the Hmong people were asked by the USA CIA to become USA soldiers in the USA secret war in Laos. After the peace treaties of 1971/1972 were signed, the USA pulled out of Southeast Asia in 1975. The Laos Communist regime then used its military defense forces to hunt down Hmong people living in the hills and jungles of Laos, and systematically raped Hmong women and young girls (as young as 10) while torturing and killing the Hmong people of all ages due to their alliance with the USA CIA secret war in Laos from 1959 to 1975. The genocide of the Hmong people started from 1975 until today (2022).

5. I am personally a witness to the following acts by Laos Communist military forces against Hmong people in Laos:

[describes the killing of his brother and brother's family while they were trying to escape from Laos]"


5.   Declaration of Helene Vang

Her declaration describes Lao military officials' murder of her brother while he was *en route* to escape and join family in Thailand.


6.   Declaration of Cha Lor

His declaration states in part:

"5.I am personally a witness to the following acts by Laos Communist military forces against Hmong people in Laos:

1. Vue Vang

2. Nhia Chong Vang

3. Va Vang

4. Xue Vang"

7. Declaration of Cher Pao Xiong

His declaration states in part:

"5.I am personally a witness to the following acts by Laos Communist military forces against Hmong people in Laos:

….my older brother had passed away from suffering under Laos communist. My older brother is Kou Xiong"

8. Declaration of Peter Lee:

His declaration states in part:

"5.I am personally a witness to the following acts by Laos Communist military forces against Hmong people in Laos:

1. Chong Lee

2. Kia Thao

3. Bong Lee

4. Xiogn Tou Lee"

9.   Declaration of Tou Cha Her:

His declaration states Laos communist regime killed grandmother on November 13, 1975; and killed his uncle in April 19, 1975.

10. Declaration of Blia Xiong:

Her declaration states in 1976, her uncle Chia Lee Xiong and his two sons were killed by communist regime in Laos; and in 1979, her father and her daughter by the communist regime.

11. Declaration of Anyx Nhia Chou Vang:

His declaration states three brothers were in Vang Pao's army, and were killed by Laos communists in 1974 and one in 1990.

12. Declaration of Bla Vang:

His declaration states in part: "Lost my dear mother and brother due to the Loo PDR ambushing our village in Laos in 1979."

13. Declaration of Charles Cheu Yang:

His declaration states in part: "My Mom, dad, and sister were killed by the Lao PDR in 1975."

14. Declaration of Chayee Xiong:

45

His declaration states in part: "My village had been destroyed in 7975 and the Lao soldiers killed one of my brothers. ln 1979, another brother of mine hod been tortured and murdered"

15. Declaration of Cher Pao Vang:

His declaration states in part:

> "ln May of 1977. there were airplanes that released a chemical known as "yellow rain" upon the Hmong villages. Mv mom went to the garden to pick a few herbs and vegetables to cook a meal. She somehow got in contact with the chemical and passed away from it overnight.
>
> Another instance of these hateful act happened in 1979 to mv aunt Mao Vane. She went out one day to harvest some wheat. on the way home, she was shot point blank and died on the scene. we couldn't even bring her body back to prepare a proper burial for her."

16. Declaration of Chia Moua Vang:

His declaration states that his uncle is still in the jungle of Laos; his uncle's families were killed by Laos government.

17.  Declaration of Coley Tang Vang:

His declaration states the following victims of the Laos PDR regime:

> Yeng Vang – uncle killed by Laos Communists
>
> Yeng Vang – other uncle, shot and killed with AK-47 by Laos Communists

Ying Yang – uncle from Mom's side; shot and killed

Xia Dang Yang – my uncle from mom's side – tortured and killed

These occurred around 1981.

18.  Declaration of Ka Vang:

His declaration states: "Song Chong Yang,, Tou Lee Yang, Nhia Long Yang, Xao Vue and his family's five people; Ger Vang Wa Tong's wife; Pao Xa Teng Vang, still more I can't remember, when I came across a Meakhong River I saw more than 15 people dead"

19. Declaration of Kamai Yang:

Her declaration states in part: "Lao PDR used weapons and chemical to eliminate the Hmong people, our writing system, and religion. They destroy our homes, farms, livestock, cookware, and clothes"

20. Declaration of Koua Xiong:

His declaration states in part: "My parents and siblings perished in the jungle of Lao due to being hunted like animals by the Lao government. I am an orphan to this very day because the Americans enlisted young Hmong men and women to assist the US Army and teach them guerilla warfare."

**Plaintiffs' Own Direct Experience with Being Victims of the Atrocities Committed by the Laos People's Democratic Republic**

76. We submit the following personal stories of each of the plaintiffs in this action as further evidence of the campaign of atrocities committed by Laos against Hmong people, including the plaintiffs named herein:

47

77. Seng Xiong

The following information about Plaintiff Seng Xiong is taken directly from testimony given under oath and under penalty of perjury during the September 23, 2022 merits hearing on his application for protection under the Convention against Torture before the United States Immigrations Court in El Paso Texas, Hon. Michael Pleters, Judge presiding:. See Reporter Transcript, page 45, lines 5-23:

"Q. You mentioned that if these people try to go to Laos, they might not be allowed in.··Let me ask that about you.··If you were -- if you showed up right now to the Laos Airport, do you think they would let you in?

A.  No, they will take me into custody right away.

Q. So you wouldn't -- you would be taken somewhere besides -- you would not be allowed to just walk through the airport, you know, get in front of the airport, get a taxi, and take off?

A.  No, no, not in Laos, no.

HONORABLE JUDGE M. PLETERS:··Why is that, sir? Hold on. Why is that, sir?

SENG XIONG: Because they know who I am. Reported by Dr. Yang Dao and other people to the Lao embassy in Washington, DC, and in Vientiane, so they know who I am.··Because I have raised the Hmong prosecution at the United Nations and also with US State Department and US Senate, so they know -- they all know who I am."


See also Reporter's Transcript, page 25, line 8 - page 26, line 5 [ROA.0031]:

"Q. Did your father -- was he actually any kind of a soldier for the US CIA?

A. No, my dad wasn't, no.

Q. Was anyone in your family -- uncles, aunts, grandmother, grandfather, anybody like that -- a solider for the US CIA Army?

A. Yes, my -- my -- my uncle, my brothers -- younger brother.··He's the -- he's a soldier for Vang Pao.

Q. And what was your understanding about the Laos government's killing of Hmong people, did they want to·kill all of them or a subpart of them or what?

A. Only people who had sided with Vang Pao.

Q. And was your family on the side of Vang Pao?

A. Yes, my family was, yes.

Q. Okay. And so your family, would you consider -- well, were members of your family killed by Laos military?

A. My dad's cousin is killed by the -- from what I understand was probably Pathet Lao's regime in the Eastern Laos, yes.

Q. Okay. You were -- you and your family were able to get out, though; is that the case?

A. Yes. We got out before the -- Pathet Lao take over the country."

See also Reporter's Transcript, page 20, lines 10-20, where Seng Xiong describes who Vang Pao is:

"SENG XIONG:   Vang Pao, yes.

HONORABLE JUDGE M. PLETERS:   He was a Hmong general?

SENG XIONG:   He's a Hmong general recruited by the Mr. -- [unintelligible] -- which is a CIA agent that sent by -- [unintelligible] -- from the PAO United States to recruit the Hmong people in – [unintelligible] -- in Laos to fight against Communist Pathet Lao and Vietnamese Army --

HONORABLE JUDGE M. PLETERS:   Okay.

SENG XIONG:   -- in Central Laos."


78. <u>Thao Xiong</u>

Plaintiff Thao Xiong has the following personal information:

Plaintiff Thao Xong was born in 1966 in the town of Doung Pahim, Xiengkouang, Laos.

He currently lived in Minneapolis, Minnesota. He is 56 years of age as of 2023. His dad,

Xia Vue Xiong, was an Army Officer of the French Foreign Legion in Indochina. His

older brother, Tong Yang Xiong was a soldier for General Vang Pao until 1973.

When the Cease Fire Agreement signed in 1973 in Vientiane, Laos, his family was in

Moung Cha, Province of Xiengkhouang. They were there until 1975 when they heard that

the Communist Pathet Lao going to punish Hmong people who fought with Vang Pao.

They decided to leave the country, when they reached the town Him Heu, they were

ambushed by Lao Communist forces. Many people died and they turned back and

decided to hide in the jungle from 1975 to 1984. During this time he has witnessed many

Hmong people who have taken refuge in the jungle being killed by Lao and Vietnamese

soldiers; he has took up arms to defend against Communist Lao and Communist

Vietnamese forces while he was in the jungle of Laos. He left Laos in 1984 to Thailand

crossing jungles and the Mekong River. He was stationed in the Refugees camp in Ban

Vinai for 5 years. He left Thailand to the United States, settled in Marysville, California

in 1989.

He joined the World Hmong People's Congress in 2005 to pursue Self-determination.  He

has advocated with World Hmong People's Congress at the United Nations Headquarters

in New York City in 2005 and 2007 to lobby the International Communities to stop the

Hmong genocide in the Lao PDR.

In 2014, he became a member/supporter of Hmong Tebchaws or Hmong Country movement in Fresno, California. A Hmong Country is the only way they can protect ourselves from persecution.

79. Lor Vang

Plaintiff Lor Vang has the following personal information:

Plaintiff Lor Vang was born in 1966 in the town of Tani, Moung Mog, Province of Xiengkhouang, Laos. His dad, Za Teng Vang, was a local militia Officer for General Vang Pao. His dad would sometime go to meet with General Vang Pao in Long Cheng for briefing of the war against communist forces.

When the Cease Fire Agreement was signed in Vientiane, Laos in 1973, his family did not know anything about it. When the Communist Lao soldiers came to his town and started to destroy their crops, arresting leaders, elders and attacking them in 1976, they decided to hide in the jungle until 1978 when his dad took the family to Thailand.

When they reached Thailand, they stayed in Nong Khai for a few years before they were transferred to the Refugees camp in Ban Vinai. When the Refugees camp was closed in Ban Vinai, they were transferred to Ban Napho and then to Wat Tham Krabok sanctuary temple. They remained there until early 2004 when they were given Refugees visa to come to the United States. They settled in Milwaukee, Wisconsin in September, 2004.

He joined the Hmong Tebchaws, Hmong Country Mission in 2014 in Fresno, California as a supporter for his has seen many videos and pictures of Hmong girls, boys and elders being killed and slaughtered by Lao Communist forces in Laos. He felt that he had to do something to save the Hmong people.

He believes that a Hmong Country will save their people from acts of violence, discrimination, to have peace, freedoms and salvation.

80. <u>Lue Vang</u>

Plaintiff Lue Vang has the following personal information

Plaintiff Lue Vang  was born in 1963 in the Hmong village of Doung Tho,

Xiengkhouang, Laos. His dad, Xia Soua Vang, was a local soldier for General Vang Pao.

His dad's role is to guard the town, relay information on the war to the local residence.

His dad told us that there was a Cease Fire Agreement in Vientiane to end the war, but

his did not believe that they would be safe and decided to leave Laos. They went to

Thailand sometime late in 1975. They were stationed in Non Khai, Thailand for a while

until they were transferred to the Refugees camp in Ban Vina. They remained there until

1980 when we were interviewed by US government officials and given entrance into the

United States. They settled in Santa Ana, California.

His dad was a Member of General Vang Pao political organization, Neohom, based in

Orange County, California to retake the Country back from Communist Lao. He

supported General Vang Pao until Pao's death in 1997.

He joined and supported the Hmong Country movement to establish a Hmong Country in

2015 when he heard it on a conference call (712) 432 -5232. He believed that the  Hmong

have to have a country of their own so no one can hurt them or destroy them. He will do

anything to help the Hmong Country project.


**V.**
**VIOLATION OF VIETNAM WAR ERA PEACE TREATIES AND WAR CRIMES**
**TREATIES**


81. Plaintiffs assert the following violations of the series of Vietnam era peace treaties as

well as war crimes treaties that have become the laws of nations. which Laos is bound by,

and which Laos has violated.

52

82. Plaintiffs seek to enjoin the Laos government and the individual defendants herein from further atrocities and violation of these treaties, and cite these treaties as something that they each as a third party can enforce. See e.g., Kolovrat v. Oregon, 366 U.S. 187 (1961) (enforcing a Yugoslav citizen's right under U.S.-Serbia treaty to inherit personal property located in Oregon); Clark v. Allen, 331 U.S. 503 (1947) (enforcing a German citizens' right to inherit property in California).

83. The 1973 Vientiane Ceasefire Agreement provides the following provisions which Plaintiff claims were violated by the Defendants atrocities committed against the Hmong people, including Plaintiffs herein:

Article 1 para B [Excerpts of the 1973 Vientiane Ceasefire Agreement]:

"The 9 July 1962 communique on the neutrality of Laos and the 1962 Geneva Agreement on Laos are the correct basis of the policy of peace, independence and neutrality of the Kingdom of Laos."

Article 2:

"Beginning at 1200 (0500 GMT-FBIS) on 22 February 1973, a cease-fire in place will be observed simultaneously throughout the territory of Laos."

Article 5:

"The two Laos sides will repatriate all persons, regardless of nationality, who were captured or detained because they collaborated with one side or the other in the war"

Article 6:

"General free and democratic elections are to be carried out to establish the national assembly and permanent national coalition government, which are to be the genuine representatives of the people of all nationalities in Laos."

84. The 1973 Vientiane Ceasefire Agreement for Laos required a cessation of war activity, yet Laos commenced a war against Hmong people. The cease fire agreement required democratic elections which never happened. They should happen now.

85. The 1973 Vientiane Ceasefire Agreement further requires Laos to comply with the 1962 Geneva Convention, which makes illegal certain war activities including use of chemical poisons; use of rape; genocide; torture; mutilation; organ removal.

86. The 1962 Geneva Convention is cited separately as its own treaty violated by the above described atrocities committed under the official policy of the country of Laos against Hmong people including: war crimes; use of rape; chemical warfare; mutilation and torture.

87. The following provisions of the 1962 Geneva Convention were violated by Defendants conduct:

Part III, Article 3 of the 1962 Geneva Convention the following:

"In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

(1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria. To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) violence to life and person, in particular, murder of all kinds, mutilation, cruel treatment and torture;

(b) taking of hostages;

I outrages upon personal dignity, in particular, humiliating and degrading treatment;
(d) the passing of sentences and the carrying out of executions without previous judgment
pronounced by a regularly constituted court, affording all the judicial guarantees which are
civilized55as indispensable by civilized peoples"

Part III, Article 27 of the 1962 Geneva Convention provides: "Women shall be especially
protected against any attack on their honour, in particular against rape, enforced
prostitution, or any form of indecent assault."

Part III, Article 32 of the 1962 Geneva Convention provides:
"The High Contracting Parties specifically agree that each of them is prohibited from
taking any measure of such a character as to cause the physical suffering or extermination
of protected persons in their hands. This prohibition applies not only to murder, torture,
corporal punishment, mutilation and medical or scientific experiments not necessitated by
the medical treatment of a protected person, but also to any other measures of brutality
whether applied by civilian or military agents. No protected person may be punished for
an offence he or she has not personally committed. Collective penalties and likewise all
measures of intimidation or of terrorism are prohibited. Pillage is prohibited.
Reprisals against protected persons and their property are prohibited.

88. The following further treaty is invoked as violated by Defendants conduct: 1966
    International Covenant on Civil and Political Rights.

89. The conduct of Defendants constitutes a violation of international law and treaties in that
    the Defendants used an official military and legal campaign constituting an act of war
    against the Hmong people; in complete defiance of the 1973 Vientiane Ceasefire
    Agreement.

90. The campaign of atrocities against the Hmong people, occurred as a direct result of the Laotian Communist regime's refusal to implement one of the key provisions of the 1973 Vientiane Ceasefire Agreement, which was the requirement that the government of Laos hold Democratic Elections. Plaintiffs submit that had democratic elections occurred and democratically elected officials been placed in charge of the governing of Laos, that this campaign of horrors would have stopped right then and there.

91. Plaintiffs claim this because the good people of Laos, its rank and file citizenry, where not part of the campaign against Hmong people.

92. The 1966 International Covenant on Civil and Political Rights [provides the following provisions which Plaintiffs claim were violated by Defendants conduct:

Article 2, 1966 International Covenant on Civil and Political Rights: "Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."

Article 6, Part 1, 1966 International Covenant on Civil and Political Rights: "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life."

Article 9 1966 International Covenant on Civil and Political Rights: "1. No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honour and reputation. 2. Everyone has the right to the protection of the law against such interference or attacks."

Article 16, 1966 International Covenant on Civil and Political: "Everyone shall have the right to recognition everywhere as a person before the law"

Article 26 of the 1966 International Covenant on Civil and Political Rights states: "All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."

## V.
## FIRST CLAIM FOR RELIEF FOR VIOLATION OF THE ALIEN TORT CLAIMS ACT

[Plaintiffs Seng Xiong, Thao Xiong, Lor Vang, and Lue Vang Against all Defendants]

93. This is a First Claim for Relief for Violation of the Alien Tort Claim Act, by Plaintiffs Seng Xiong, Thao Xiong, Lor Vang, and Lue Vang against defendants Lao People's Democratic Republic; President Thongloun Sisoulithis; Prime Minister Sonxai Siphandon; Souansavan Vi-gnaket, Minster of Justice; General Chansamone Chanyalath, Minister of Defense; Lieutenant General Vilay Lakhamfong, Minister of Public Security; and Dr. Yang Dao.

94. The preceding paragraphs of the Complaint are incorporated herein as though set forth in full.

95. The defendants and each of them committed a series of intentional torts against each of the plaintiffs in the form of creating an official policy of the Lao PDR to generally commence a campaign of horrors and atrocities against all Hmong people whose family

57

members were connected to the USA CIA secret war in Laos during the Vietnam War era.

96. The particulars of those atrocities and campaign of whores have been specified above and will be generally referenced in this claim for relief as the atrocities committed against the Hmong people in Laos.

97. The torts and actionable wrongdoings that arose from that conduct include the following intentional torts that each of the Plaintiffs were individually and personally aggrieved by, as was further set forth above:

98. Violation of each Plaintiff's right to peaceful and quiet enjoyment of their homes and property in Laos after the peace treaties were entered into. Instead of permitting peaceful coexistence between the Hmong people and the Laos Communist regime, the Communist regime went after the Laos people in a campaign of horrors and atrocities, which required for survival the Hmong people generally to flee into the jungles. Plaintiffs fled the country of Laos, and made their way over to Thailand, where they became refugees. They had to give up all of their homes, possessions, and belongings, including their real property their personal property livestock basically their entire lives were removed from where they had grown up where they had lived The only place they really had known. Each of the plaintiffs left louse for Thailand became refugees in Thailand and were granted refugee visas to come to USA, came to USA, and became permanent residency visa holders in the USA. Each of the plaintiffs is currently in USA as a green card holder and is thus in the category of an alien asserting this tort claim.

99. Each of the plaintiffs have a prospective economic advantage in the form of the creation of a Hmong homeland. The Lao People's Democratic Republic, with the direct participation of the named individual defendants herein, and with the assistance of Laos

spies and operatives based in the territory of the USA, and as described above, have

intentionally and willfully interfered with plaintiffs' prospective economic advantage by

taking steps to eliminate plaintiff's attempts to establish that Hmong homeland.

100.     The defendants and each of them accomplished this interference by making sure

through their spying efforts that the process of establishing a separate country for the

Hmong people would never happen.

101.     One of the events that led to a complete cessation of the Hmong homeland

campaign was done by defendant Yang Dao, who gave false police reports to the

Minnesota Police department that the Hmong homeland program was actually some kind

of an illegal gambling ring. There was never any kind of prosecution for any kind of

illegal gambling ring, but the false reporting of the illegal gambling ring was enough to

cause the Minnesota Police Department to refer the matter over to the USA Secret

Service. The USA Secret Service agents then got involved, and completed a different

kind of investigation into a claim of wire fraud and mail fraud. That claim was based on

the notion that the Hmong homeland campaign, of which all plaintiffs have been directly

and personally involved in, was actually a fraud to just collect money up from Hmong

people without any intent of ever actually establishing a Hmong homeland. This was a

false report in that plaintiffs at all times duly intended to set up a monk country, and still

have that general intent and are still undertaking efforts to establish a Hmong homeland.

102.     The US federal government took the position that such a Hmong homeland would

require official USA permission and or official United Nations permission, and that

Plaintiff Seng Xiong never obtained that permission.

103.     Unfortunately, the jury accepted that thesis, and convicted Seng Xiong during

2017 following a federal court trial in the United States District Court for the District of

Minnesota. Seng Xiong was sentenced to 8 years in prison, and was released from that imprisonment during May 2022.

104.     The other plaintiffs were not prosecuted in any way, shape, or form from that action.

105.     When the United States government arrested Seng Xiong, they also took approximately $1.2 million in donation funds that had been given over to the Hmong homeland effort. These funds were obtained as a budget to purchase lands in some willing post country. As of the time of his arrest, the target country to serve as a host country was Thailand. The concept was that the Hmong homeland campaign would purchase a large track of land in the northern part of Thailand, which before the end of the Vietnam War, actually belonged to Laos and was ceded over by treaty to Thailand. Seng Xiong was actually headed to Thailand to do negotiations and discussions with high officials about whether they would be willing to host a Hmong homeland inside their country.

106.     The concept is similar to what USA does with Native American tribes. The USA regularly allows USA tribes to operate sovereign land holdings called reservations, in which Native Americans are permitted to operate a sovereign nation of their people, complete with their own court systems; legislative bodies; executive branches in the form of tribal councils; and to conduct the regular aspects of governmental sovereignty that a country normally would possess; such as economic self-determination; business activities; housing development so people would have a place to live; education systems so people would have a place to learn; health systems so people could tend to their health needs; law enforcement officials so that there would be keepers of the peace; and citizen acceptance and approval systems that allowed for new members to arrive to the Native American nations, and become citizens of that nation.

107.     In the same way, the Hmong people seek to establish such a country/homeland in a country to have the normal sovereign rights of a country as specified above in the analogy of the Native Americans, and to do all those things that countries normally do for their citizens.

108.     The arrest of Seng Xiong brought the Hmong country/homeland program to a standstill. The government seized all the funds that would have been used and made available to buy land, and rather than allowing that program to go forward, stopped it in its tracks.

109.     As noted above, plaintiffs have continued to work on the campaign to establish a country/ homeland for the Hmong people and have not given up hope on this extremely important effort on behalf of the Hmong people.

110.     Further torts committed by the Defendants and each of them include the murder and torture of Plaintiffs' immediate family members, thus the intentional tort of intentionally assaulting and killing the plaintiffs family members. as specified above.

111.     The conduct in implementing a policy that continues through to this writing also constitutes the intentional tort of infliction of extreme emotional distress causing each of the plaintiffs general damages.

112.     The conduct in eliminating all possibility of residing peacefully in Laos after the war, constitutes the intentional tort of interference with and breach of the right to peaceful enjoyment of their property and land.

113.     The conduct in interfering with plaintiff's efforts to establish a Hmong Homeland constitutes the intentional tort of intentional interference with prospective economic

61

advantage. From the spying efforts of the defendants USA-based spies including

defendant Dao, the defendants had actual knowledge of the plaintiffs' prospective

economic advantage in terms of their efforts to locate and establish a place where Hmong

people could call home. The defendants intentionally took the efforts described above to

interfere with that perspective economic advantage with the intent to ruin and destroy all

hopes, dreams, and activities of the plaintiffs to form a Hmong homeland somewhere on

Earth.

114.      These intentional torts are all intertwined with one another, and are further part

and parcel of the overall campaign by the Laos Communist regime and each of the

defendants herein to commit a series of war crimes and atrocities against the among

people generally and including the plaintiffs specifically.

115.      As such because the defendants have committed war crimes there is no political

immunity for war crimes, nor is there any statute of limitations for commission of these

war crimes.

116.      The November 11, 1970 Convention on the Non-Applicability of Statutory

Limitations to War Crimes and Crimes Against Humanity was adopted and opened for

signature, ratification and accession by United Nations General Assembly resolution

2391 (XXIII) of 26 November 1968. Pursuant to the provisions of its Article VIII (90

days following the deposit of the tenth ratification), it came into force on 11 November

1970.

117.      The Convention provides that no signatory state may apply statutory

limitations to:

- War crimes as they are defined in the Charter of the Nürnberg International Military

    Tribunal of 8 August 1945.

*Xiong et al. v. Laos et al.*
COMPLAINT FOR DAMAGES UNDER THE ALIEN TORT CLAIMS ACT; INJUNCTIVE RELIEF; DECLARATORY RELIEF;
ATTORNEYS FEES; REQUEST FOR JURY TRIAL

Crimes against humanity, whether committed in time of war or in time of peace, as defined in the Charter of the Nürnberg International Military Tribunal, eviction by armed attack or occupation, inhuman acts resulting from the policy of apartheid, and the crime of genocide as defined in the 1948 Convention on the Prevention and Punishment of the Crime of Genocide

118.     The conduct of the defendants and each of them constitutes war crimes and violations of war crimes treaties also specified above.

119.     The conduct of defendants and each of them further constitute violation of treaties created during the process of ending the Vietnam War during 1973 to 1974, and as specified above. The peace treaties included a general ceasefire, a stoppage of all war activity, and an end to the war. The peace treaties called for democratic elections in Laos. Instead of doing democratic elections, the Lao People Democratic Republic installed a communist system without any kind of election concept at all, which was based on the typical communist programs where their leaders are appointed for life to rule the country as a dictator. This was what was done in Laos, and as was also done elsewhere in Vietnam, North Korea, the Soviet Union, and China.

120.     The peace treaty sought to protect the Lao Hmong people and the Lao people as well. The defendants openly violated the material aspects of those peace treaties by rounding up all Laos intellectuals and royals, and putting them into concentration camps [or prisons, as they really are], which they euphemistically referred to in the Communist nomenclature as re-education camps. Most members of the royal family, including the King and Queen of Laos perished in these camps. Some got away and are still alive in Canada and in France. Many other Lao people died in these reeducation camps. The Hmong people fled to the jungles, where they were hunted like animals, shot down from

the sky, poisoned with ammunition left behind by the USA government when it left Laos, which included helicopters, airplanes, and barrels of poison that were dumped down into the jungles where the Hmong people hid, and destroyed their rivers, forests, and generally the entire ecosystem of the jungle. Lao soldiers were ordered to undertake a campaign to go into these jungles find the Hmong people, shoot them on site, rape the girls, torture the men and women alike, poison the elderly, and basically kill all of them. Estimates in the press are that something like over 300,000 Hmong people were killed in this process. The campaign is an ongoing genocide in Laos. There are believed to be somewhere around 3,000 Hmong people still left in these jungles that are still actively being hunted, killed, and murdered by the Lao PDR as part and parcel of its campaign to eliminate the Hmong people.

121.     As part and parcel of these atrocities committed by defendants and each of them, they have also commenced upon a campaign to make sure that the Hmong people can never have their own homeland. The defendants, and each of them, have taken affirmative steps, including activities in the territory of the USA to stop the Hmong Homeland effort, and to make sure that the Hmong people never have a place to call home.

122.     The defendants, and each of their, behavior and conduct in these matters were intentional willful obscene and done with conscious disregard and deliberate indifference to the rights of the plaintiffs herein, as well as all other individuals including the Laos royal family members, Laos nationals, and Hmong peoples' right to exist peacefully in Laos.

123.     The behavior and conduct of the defendants and each of them was a substantial factor in causing each of the plaintiffs substantial general damages for the loss of their homeland and country land, for the loss of their family members, for the loss of their

right to peacefully stay in Laos, and for the loss of their effort to establish a new Hmong homeland. Each plaintiff claims damages in the amount of $20 million US dollars for a total of $80 million US dollars against each of the defendants herein, or such other amount of damages as is according to proof.

124.    Plaintiffs further seek and request equitable relief and injunctive relief in the form of a temporary restraining order, a preliminary injunction, and a permanent injunction barring the defendants and each of them from taking any further efforts to interfere with the Plaintiffs' program to establish a Hmong Homeland somewhere on this Earth. Plaintiffs are still actively seeking a host country to permit such a homeland and are actively searching in Philippines, Thailand, and in the USA.

125.    This injunctive relief requests that the defendants and each of them be barred by any further conduct to interfere with the program to establish a Hmong homeland, or such other injunctive relief as a court deems just an appropriate.

126.    Plaintiffs further seek injunctive relief in the form of an order requiring the last government and defendants named herein to abide by the peace treaties and hold democratic elections as they agreed to in the peace treaties.

127.    This injunctive relief requests further orders requiring the Laos government and the defendants named herein to cease and desist from any further war crimes against the Hmong people, including the genocide of the Hmong people; the rape, torture, and murder of the Hmong people; the destruction of the jungle where the Hmong people are currently hiding out in; and other crimes according to proof committed by the defendants herein. This conduct is ongoing, and is expected to be continued until every single Hmong person having direct or family involvement in the USA CIA's secret war in Laos is wiped off the face of the Earth.

128.     Plaintiffs have suffered and will continue to suffer irreparable harm in the form of losing their homes property and life in  Laos, and due to the interference with the plaintiffs' efforts to establish a Hmong homeland, and other irreparable harms for which plaintiffs are without an adequate remedy at law.

129.     Plaintiffs further seek such other injunctive  relief as the court deems just and appropriate.

130.     Plaintiffs seek further equitable relief in the form of an accounting to determine appropriate restitution amounts that the defendants should be required to pay over to the plaintiffs as a result of the defendants taking over the plaintiffs' lands, property, and holdings and using those lands property and holdings for their own purposes to the detriment and loss of each of the plaintiffs. The amount of restitution claimed herein is not known to the plaintiffs, but is believed to be in excess of $1 million each, and is requested in an amount according to proof.

131.     Plaintiffs by this action also requires such other further equitable, restitutionary, and other provisional remedies as the Court deems just and appropriate.

132.     Plaintiffs in each of them for their request exemplary damages against defendants Lao People's Democratic Republic; President Thongloun Sisoulithis; Prime Minister Sonxai Siphandon; Souansavan Vi-gnaket, Minster of Justice; General Chansamone Chanyalath, Minister of Defense; Lieutenant General Vilay Lakhamfong, Minister of Public Security; and Dr. Yang Dao for their willful, oppressive, fraudulent, obscene, and conscious disregard and deliberate indifference to plaintiffs rights, in an amount according to proof and commensurate and proportionate with whatever level of compensatory damages are awarded against the defendants, and in the approximate amount of $20 million for each plaintiff against each defendant named herein.

66

133.     Plaintiffs and each of them further seek declaratory relief in the form of an order by the Court declaring that the defendants' behavior and conduct as discussed in this complaint was actually and factually committed by the defendants, and that such behavior violates the Alien Tort Claims Act, that such behavior is continuing in nature and is expected to continue into the reasonably foreseeable future, that the plaintiffs will be irreparably harmed by such behavior and that unless until injunctive relief is given the plaintiff's will continue to suffer irreparable harm, and such other declaratory orders and relief as the court deems just and appropriate.

# VI.
## PRAYER FOR RELIEF

Wherefore Plaintiffs Seng Xiong, Thao Xiong, Lor Vang, and Lue Vang pray for relief as follows:

1.  For a judgment in each of plaintiffs Seng Xiong, Thao Xiong, Lor Vang, and Lue Vang's favor and against each of the named defendants Lao People's Democratic Republic; President Thongloun Sisoulithis; Prime Minister Sonxai Siphandon; Souansavan Vi-gnaket, Minster of Justice; General Chansamone Chanyalath, Minister of Defense; Lieutenant General Vilay Lakhamfong, Minister of Public Security; and Dr. Yang Dao adjudging the defendants in each of them to be liable to plaintiffs for violation of the alien toward claims act, 28 U.S.C section 1350, for the commission of the intentional torts discussed and described above, and that each of the plaintiffs shall be awarded compensatory damages as requested above in the amount of $20 million for each plaintiff for a total of $80 million US dollars against each and all defendants jointly and severely, or in such other amounts according to proof.

2.  For injunctive relief as requested above or such other injunctive relief as the Court deems just and appropriate.

3. For an accounting, restitutionary remedies, and other provisional remedies as requested above and as the Court deems just and appropriate.

4. For exemplary/punitive damages against each of the defendants Lao People's Democratic Republic; President Thongloun Sisoulithis; Prime Minister Sonxai Siphandon; Souansavan Vi-gnaket, Minster of Justice; General Chansamone Chanyalath, Minister of Defense; Lieutenant General Vilay Lakhamfong, Minister of Public Security; and Dr. Yang Dao in an amount according to proof, but at least $20 million for each plaintiff for a total of at least $80 million against each defendant jointly and severally, or in such amount as the Court deems just and appropriate according to proof.

5. For declaratory relief as requested above for such other declaratory relief as the Court deems just and appropriate.

6. For such other further relief as a court dames just and appropriate.

7. For court cost incurred in the filing and prosecution of this case.

Respectfully Submitted,

/s/ Herman Franck, Esq.                          November 2, 2023
Herman Franck, Esq.
Attorney for Plaintiffs
Seng Xiong, Thao Xiong, Lor Vang, and Lue Vang

68

# DEMAND FOR JURY TRIAL

Plaintiff herewith submit this DEMAND FOR JURY TRIAL, and request a jury trial as to all claims asserted herein that are triable to a jury.

Respectfully Submitted,

__/s/ Herman Franck, Esq._____          November 2, 2023
Herman Franck, Esq.
Attorney for Plaintiffs
Seng Xiong, Thao Xiong, Lor Vang, and Lue Vang

69

## LIST OF EXHIBITS

Exhibit A: United States CIA report on the Lao People's Democratic Republic

Exhibit B: Submission of statements by the United States Attorney for the Eastern District of California regarding its reasons for dismissing the criminal case against general Pao and other Hmong defendants (not Plaintiffs herein) that admit a host of lies were used in that case. These statements are made to support Plaintiffs' contentions and allegations that the Laos government does operate a spy network in the territory of the United States and in the Eastern District of California to spy on Hmong people and to falsely report peaceful activities as being criminal activities leading to false prosecutions and a dismissal.

Exhibit C: Excerpts of Appellants' Openign Brief in Vang et al. v. Decker et al., Ninth Circuit Court of Appeals Case No. 16-15443

Exhibit D: Declaration of Cher Pao Xiong describing how he was not a victim of Seng Xiong's mission to create a Hmong homeland/country

Exhibit E: Declaration of Pao Xiong describing how he had not received back his entire contribution to the Hmong homeland mission as restitution resulting from Seng Xiong's criminal case

*Xiong et al. v. Laos et al.*
COMPLAINT FOR DAMAGES UNDER THE ALIEN TORT CLAIMS ACT; INJUNCTIVE RELIEF; DECLARATORY RELIEF;
ATTORNEYS FEES; REQUEST FOR JURY TRIAL

# Exhibit A

# Explore All Countries Laos

East and Southeast Asia

Page last updated: September 25, 2023



## INTRODUCTION

### Background

Modern-day Laos has its roots in the ancient Lao kingdom of Lan Xang, established in the 14th century under King FA NGUM. For 300 years Lan Xang had influence reaching into present-day Cambodia and Thailand, as well as over all of what is now Laos. After centuries of gradual decline, Laos came under the domination of Siam (Thailand) from the late 18th century until the late 19th century, when it became part of French Indochina. The Franco-Siamese Treaty of 1907 defined the current Lao border with Thailand. In 1975, the communist Pathet Lao took control of the government, ending a six-century-old monarchy and instituting a strict socialist regime closely aligned to Vietnam. A gradual, limited return to private enterprise and the liberalization of foreign investment laws began in 1988. Laos became a member of ASEAN in 1997 and the WTO in 2013.

In the 2010s, the country benefited from direct foreign investment, particularly in the natural resource and industry sectors. Construction of a number of large hydropower dams and expanding mining activities have also boosted the economy. Laos has retained its official commitment to communism and maintains close ties with its two communist neighbors, Vietnam and China, both of which continue to exert substantial political and economic influence on the country. China, for example, provided 70% of the funding for a $5.9 billion, 400-km railway line between the Chinese border and the capital Vientiane, which opened for operations in December 2021. Laos financed the remaining 30% with loans from China. At the same time, Laos has expanded its economic reliance on the West and other Asian countries, such as Japan, Malaysia, Singapore, Taiwan, and Thailand. In 2023, Lao households faced the highest inflation in almost a quarter century, with year-on-year inflation reaching 40% early in the year.

## GEOGRAPHY

### Location

Southeastern Asia, northeast of Thailand, west of Vietnam

### Geographic coordinates

18 00 N, 105 00 E

### Map references

Southeast Asia

### Area

**total:** 236,800 sq km

**land:** 230,800 sq km

**water:** 6,000 sq km

comparison ranking: total 84

**Area - comparative**

about twice the size of Pennsylvania; slightly larger than Utah

## Area comparison map:



**Land boundaries**

**total:** 5,274 km

**border countries (5):** Burma 238 km; Cambodia 555 km; China 475 km; Thailand 1,845 km; Vietnam 2,161 km

**Coastline**

0 km (landlocked)

**Maritime claims**

none (landlocked)

**Climate**

tropical monsoon; rainy season (May to November); dry season (December to April)

**Terrain**

mostly rugged mountains; some plains and plateaus

**Elevation**

**highest point:** Phu Bia 2,817 m

**lowest point:** Mekong River 70 m

**mean elevation:** 710 m

**Natural resources**

timber, hydropower, gypsum, tin, gold, gemstones

**Land use**

**agricultural land:** 10.6% (2018 est.)

**arable land:** 6.2% (2018 est.)

**permanent crops:** 0.7% (2018 est.)

**permanent pasture:** 3.7% (2018 est.)

**forest:** 67.9% (2018 est.)

**other:** 21.5% (2018 est.)

**Irrigated land**

4,409 sq km (2020)

**Major rivers** (by length in km)

Mènam Khong (Mekong) (shared with China [s], Burma, Thailand, Cambodia, and Vietnam [m]) - 4,350 km **note** – [s] after country name indicates river source; [m] after country name indicates river mouth

**Major watersheds (area sq km)**

Pacific Ocean drainage: Mekong (805,604 sq km)

**Population distribution**

most densely populated area is in and around the capital city of Vientiane; large communities are primarily found along the Mekong River along the southwestern border; overall density is considered one of the lowest in Southeast Asia

**Natural hazards**

floods, droughts

**Geography - note**

landlocked; most of the country is mountainous and thickly forested; the Mekong River forms a large part of the western boundary with Thailand

## PEOPLE AND SOCIETY

**Population**

7,852,377 (2023 est.)
comparison ranking: 103

**Nationality**

**noun:** Lao(s) or Laotian(s)

**adjective:** Lao or Laotian

**Ethnic groups**

Lao 53.2%, Khmou 11%, Hmong 9.2%, Phouthay 3.4%, Tai 3.1%, Makong 2.5%, Katong 2.2%, Lue 2%, Akha 1.8%, other 11.6% (2015 est.)

**note:** the Laos Government officially recognizes 49 ethnic groups, but the total number of ethnic groups is estimated to be well over 200

**Languages**

Lao (official), French, English, various ethnic languages

**major-language sample(s):**
ແຫລ່ງຫ້າວລະບໍໄດ້ຂ່າວໃນຂໍ້ມູນຕົ້ນຕໍ" (Lao)

The World Factbook, the indispensable source for basic information.

## Lao audio sample:

**Religions**

Buddhist 64.7%, Christian 1.7%, none 31.4%, other/not stated 2.1% (2015 est.)

**Demographic profile**

Laos is a predominantly rural country with a youthful population – almost 55% of the population is under the age of 25. Its progress on health and development issues has been uneven geographically, among ethnic groups, and socioeconomically. Laos has made headway in poverty reduction, with the poverty rate almost halving from 46% in 1992/93 to 22% in 2012/13. Nevertheless, pronounced rural-urban disparities persist, and income inequality is rising. Poverty most affects populations in rural and highland areas, particularly ethnic minority groups.

The total fertility rate (TFR) has decreased markedly from around 6 births per woman on average in 1990 to approximately 2.8 in 2016, but it is still one of the highest in Southeast Asia. TFR is higher in rural and remote areas, among ethnic minority groups, the less-educated, and the poor; it is lower in urban areas and among the more educated and those with higher incomes. Although Laos' mortality rates have improved substantially over the last few decades, the maternal mortality rate and childhood malnutrition remain at high levels. As fertility and mortality rates continue to decline, the proportion of Laos' working-age population will increase, and its share of dependents will shrink. The age structure shift will provide Laos with the potential to realize a demographic dividend during

Case 2:23-cv-02531-DJC-DB  Document 1  Filed 11/02/23  Page 75 of 126

the next few decades, if it can improve educational access and quality and gainfully employ its growing working-age population in productive sectors. Currently, Laos primary school enrollment is nearly universal, but the drop-out rate remains problematic. Secondary school enrollment has also increased but remains low, especially for girls.

Laos has historically been a country of emigration and internal displacement due to conflict and a weak economy. The Laos civil war (1953 – 1975) mainly caused internal displacement (numbering in the hundreds of thousands). Following the end of the Vietnam War in 1975, indigenous people in remote, war-struck areas were resettled and more than 300,000 people fled to Thailand to escape the communist regime that took power. The majority of those who sought refuge in Thailand ultimately were resettled in the US (mainly Hmong who fought with US forces), and lesser numbers went to France, Canada, and Australia.

The Laos Government carried out resettlement programs between the mid-1980s and mid-1990s to relocate ethnic minority groups from the rural northern highlands to development areas in the lowlands ostensibly to alleviate poverty, make basic services more accessible, eliminate slash-and-burn agriculture and opium production, integrate ethnic minorities, and control rebel groups (including Hmong insurgents). For many, however, resettlement has exacerbated poverty, led to the loss of livelihoods, and increased food insecurity and mortality rates. As the resettlement programs started to wane in the second half of the 1990s, migration from the northern highlands to urban centers – chiefly the capital Vientiane – to pursue better jobs in the growing manufacturing and service sectors became the main type of relocation. Migration of villagers from the south seeking work in neighboring Thailand also increased. Thailand is the main international migration destination for Laotians because of the greater availability of jobs and higher pay than at home; nearly a million Laotian migrants were estimated to live in Thailand as of 2015.

## Age structure

**0-14 years:** 30.63% (male 1,218,731/female 1,186,156)

**15-64 years:** 64.73% (male 2,527,643/female 2,555,029)

**65 years and over:** 4.65% (2023 est.) (male 169,142/female 195,676)

## 2023 population pyramid:



## Dependency ratios

**total dependency ratio:** 54.7

**youth dependency ratio:** 48

**elderly dependency ratio:** 6.7

**potential support ratio:** 14.8 (2021 est.)

## Median age

**total:** 24 years

**male:** 23.7 years

**female:** 24.4 years (2020 est.)
comparison ranking: total 171

## Population growth rate

1.3% (2023 est.)
comparison ranking: 71

## Birth rate

20.35 births/1,000 population (2023 est.)
comparison ranking: 67

## Death rate

6.26 deaths/1,000 population (2023 est.)
comparison ranking: 145

## Net migration rate

-1.09 migrant(s)/1,000 population (2023 est.)
comparison ranking: 150

most densely populated area is in and around the capital city of Vientiane; large communities are primarily found along the Mekong River along the southwestern border; overall density is considered one of the lowest in Southeast Asia

**Urbanization**

**urban population:** 38.2% of total population (2023)

**rate of urbanization:** 2.99% annual rate of change (2020-25 est.)

**Major urban areas - population**

721,000 VIENTIANE (capital) (2023)

**Sex ratio**

**at birth:** 1.04 male(s)/female

**0-14 years:** 1.03 male(s)/female

**15-64 years:** 0.99 male(s)/female

**65 years and over:** 0.86 male(s)/female

**total population:** 0.99 male(s)/female (2023 est.)

**Maternal mortality ratio**

126 deaths/100,000 live births (2020 est.)
comparison ranking: 60

**Infant mortality rate**

**total:** 36.56 deaths/1,000 live births

**male:** 40.38 deaths/1,000 live births

**female:** 32.59 deaths/1,000 live births (2023 est.)
comparison ranking: total 37

**Life expectancy at birth**

**total population:** 68.59 years

**male:** 66.95 years

**female:** 70.31 years (2023 est.)
comparison ranking: total population 183

**Total fertility rate**

2.3 children born/woman (2023 est.)
comparison ranking: 76

**Gross reproduction rate**

1.13 (2023 est.)

**Contraceptive prevalence rate**

54.1% (2017)

**Drinking water source**

**improved:** urban: 97.1% of population

rural: 84.1% of population

total: 88.8% of population

Case 2:23-cv-02531-DJC-DB   Document 1   Filed 11/02/23   Page 77 of 126

**unimproved:** urban: 2.9% of population

rural: 15.9% of population

total: 11.2% of population (2020 est.)

**Current health expenditure**

2.7% of GDP (2020)

**Physicians density**

0.35 physicians/1,000 population (2020)

**Hospital bed density**

1.5 beds/1,000 population (2012)

**Sanitation facility access**

**improved:** urban: 100% of population

rural: 72% of population

total: 82.2% of population

**unimproved:** urban: 0% of population

rural: 28% of population

total: 17.8% of population (2020 est.)

**Major infectious diseases**

**degree of risk:** very high (2023)

**food or waterborne diseases:** bacterial and protozoal diarrhea, hepatitis A, and typhoid fever

**vectorborne diseases:** dengue fever and malaria

**Obesity - adult prevalence rate**

5.3% (2016)
comparison ranking: 179

**Alcohol consumption per capita**

**total:** 8.15 liters of pure alcohol (2019 est.)

**beer:** 3.62 liters of pure alcohol (2019 est.)

**wine:** 0.07 liters of pure alcohol (2019 est.)

**spirits:** 4.46 liters of pure alcohol (2019 est.)

**other alcohols:** 0 liters of pure alcohol (2019 est.)
comparison ranking: total 42

**Tobacco use**

**total:** 31.8% (2020 est.)

**male:** 53.3% (2020 est.)

**female:** 10.3% (2020 est.)
comparison ranking: total 21

**Children under the age of 5 years underweight**

21.1% (2017)
comparison ranking: 18

Currently married women (ages 15-49)

60.1% (2023 est.)

**Child marriage**

**women married by age 15:** 7.1%

**women married by age 18:** 32.7%

**men married by age 18:** 10.8% (2017 est.)

**Education expenditures**

2.3% of GDP (2020 est.)
comparison ranking: 179

**Literacy**

**definition:** age 15 and over can read and write

**total population:** 87.1%

**male:** 91.4%

**female:** 81.4% (2021)

**School life expectancy (primary to tertiary education)**

**total:** 10 years

**male:** 10 years

**female:** 10 years (2020)

**Youth unemployment rate (ages 15-24)**

**total:** 3.3%

**male:** 3.4%

**female:** 3.2% (2021 est.)
comparison ranking: total 196


## ENVIRONMENT

**Environment - current issues**

unexploded ordnance; deforestation; soil erosion; loss of biodiversity; water pollution, most of the population does not have access to potable water

**Environment - international agreements**

**party to:** Biodiversity, Climate Change, Climate Change-Kyoto Protocol, Climate Change-Paris Agreement, Comprehensive Nuclear Test Ban, Desertification, Endangered Species, Environmental Modification, Hazardous Wastes, Law of the Sea, Nuclear Test Ban, Ozone Layer Protection, Wetlands, Whaling

**signed, but not ratified:** none of the selected agreements

**Climate**

tropical monsoon; rainy season (May to November); dry season (December to April)

**Land use**

**agricultural land:** 10.6% (2018 est.)

**arable land:** 6.2% (2018 est.)

**permanent crops:** 0.7% (2018 est.)

permanent pasture: 3.7% (2018 est.)

**forest:** 67.9% (2018 est.)

**other:** 21.5% (2018 est.)

**Urbanization**

**urban population:** 38.2% of total population (2023)

**rate of urbanization:** 2.99% annual rate of change (2020-25 est.)

**Revenue from forest resources**

1.48% of GDP (2018 est.)
comparison ranking: 44

**Air pollutants**

**particulate matter emissions:** 24.49 micrograms per cubic meter (2016 est.)

**carbon dioxide emissions:** 17.76 megatons (2016 est.)

**methane emissions:** 9 megatons (2020 est.)

**Waste and recycling**

**municipal solid waste generated annually:** 351,900 tons (2015 est.)

**municipal solid waste recycled annually:** 35,190 tons (2015 est.)

**percent of municipal solid waste recycled:** 10% (2015 est.)

**Major rivers (by length in km)**

Mènam Khong (Mekong) (shared with China [s], Burma, Thailand, Cambodia, and Vietnam [m]) - 4,350 km **note** – [s] after country name indicates river source; [m] after country name indicates river mouth

**Major watersheds (area sq km)**

Pacific Ocean drainage: Mekong (805,604 sq km)

**Total water withdrawal**

**municipal:** 130 million cubic meters (2020 est.)

**industrial:** 170 million cubic meters (2020 est.)

**agricultural:** 7.05 billion cubic meters (2020 est.)

**Total renewable water resources**

333.5 billion cubic meters (2020 est.)


## GOVERNMENT

**Country name**

**conventional long form:** Lao People's Democratic Republic

**conventional short form:** Laos

**local long form:** Sathalanalat Paxathipatai Paxaxon Lao

**local short form:** Mueang Lao (unofficial)

**abbreviation:** Lao PDR

**etymology:** name means "Land of the Lao [people]"

**Government type**

communist state

**Capital**

**name:** Vientiane (Viangchan)

**geographic coordinates:** 17 58 N, 102 36 E

**time difference:** UTC+7 (12 hours ahead of Washington, DC, during Standard Time)

**etymology:** the meaning in Pali, a Buddhist liturgical language, is "city of sandalwood"

**Administrative divisions**

17 provinces (khoueng, singular and plural) and 1 prefecture* (kampheng nakhon); Attapu, Bokeo, Bolikhamxai, Champasak, Houaphan, Khammouan, Louangnamtha, Louangphabang (Luang Prabang), Oudomxai, Phongsali, Salavan, Savannakhet, Viangchan (Vientiane)*, Viangchan, Xaignabouli, Xaisomboun, Xekong, Xiangkhouang

**Independence**

19 July 1949 (from France by the Franco-Lao General Convention); 22 October 1953 (Franco-Lao Treaty recognizes full independence)

**National holiday**

Republic Day (National Day), 2 December (1975)

**Constitution**

**history:** previous 1947 (preindependence); latest promulgated 13-15 August 1991

**amendments:** proposed by the National Assembly; passage requires at least two-thirds majority vote of the Assembly membership and promulgation by the president of the republic; amended 2003, 2015

**Legal system**

civil law system similar in form to the French system

**International law organization participation**

has not submitted an ICJ jurisdiction declaration; non-party state to the ICCt

**Citizenship**

**citizenship by birth:** no

**citizenship by descent only:** at least one parent must be a citizen of Laos

**dual citizenship recognized:** no

**residency requirement for naturalization:** 10 years

**Suffrage**

18 years of age; universal

**Executive branch**

**chief of state:** President THONGLOUN Sisoulith (since 22 March 2021); Vice Presidents PANI Yathotou and BOUNTHONG Chitmani (since 22 March 2021)

**head of government:** Prime Minister SONXAI Siphandon (since 30 December 2022)

**cabinet:** Council of Ministers appointed by the president, approved by the National Assembly

**elections/appointments:** president and vice president indirectly elected by the National Assembly for a 5-year term (no term limits); election last held on 22 March 2021 (next to be held in March 2026); prime minister nominated by the president, elected by the National Assembly for 5-year term

**election results:**

Case 2:23-cv-02531-DJC-DB   Document 1   Filed 11/02/23   Page 81 of 126

*2021:* THONGLOUN Sisoulith elected president; National Assembly vote - THONGLOUN Sisoulith (LPRP 161-1; PANI Yathotou and BOUNTHONG Chitmani (LPRP) elected vice presidents; National Assembly vote - NA; PHANKHAM Viphavan (LPRP) elected prime minister; National Assembly vote - 158-3

*2016:* BOUNNYANG Vorachit (LPRP) elected president; PHANKHAM Viphavan (LPRP) elected vice president; percent of National Assembly vote - NA; THONGLOUN Sisoulith (LPRP) elected prime minister; percent of National Assembly vote - NA

### Legislative branch

**description:** unicameral National Assembly or Sapha Heng Xat (164 seats; members directly elected in multi-seat constituencies by simple majority vote from candidate lists provided by the Lao People's Revolutionary Party; members serve 5-year terms)

**elections:** last held on 21 February 2021 (next to be held in 2026)

**election results:** percent of vote by party - NA; seats by party - LPRP 158, independent 6; composition - men 128, women 36, percent of women 21.9%

### Judicial branch

**highest court(s):** People's Supreme Court (consists of the court president and organized into criminal, civil, administrative, commercial, family, and juvenile chambers, each with a vice president and several judges)

**judge selection and term of office:** president of People's Supreme Court appointed by the National Assembly upon the recommendation of the president of the republic for a 5-year term; vice presidents of the People's Supreme Court appointed by the president of the republic upon the recommendation of the National Assembly; appointment of chamber judges NA; tenure of court vice presidents and chamber judges NA

**subordinate courts:** appellate courts; provincial, municipal, district, and military courts

### Political parties and leaders

Lao People's Revolutionary Party or LPRP [THONGLOUN Sisoulit]

**note:** other parties proscribed

### International organization participation

ADB, ARF, ASEAN, CP, EAS, FAO, G-77, IAEA, IBRD, ICAO, ICRM, IDA, IFAD, IFC, IFRCS, ILO, IMF, Interpol, IOC, IPU, ISO (subscriber), ITU, MIGA, NAM, OIF, OPCW, PCA, UN, UNCTAD, UNESCO, UNIDO, UNWTO, UPU, WCO, WFTU (NGOs), WHO, WIPO, WMO, WTO

### Diplomatic representation in the US

**chief of mission:** Ambassador Sisavath INPHACHANH (since 7 June 2022)

**chancery:** 2222 S Street NW, Washington, DC 20008

**telephone:** [1] (202) 332-6416

**FAX:** [1] (202) 332-4923

**email address and website:**
embasslao@gmail.com

https://laoembassy.com/

**consulate(s):** New York

### Diplomatic representation from the US

**chief of mission:** Ambassador Peter HAYMOND (since 7 February 2020)

**embassy:** Ban Somvang Tai, Thadeua Road, Km 9, Hatsayfong District, Vientiane

**mailing address:** 4350 Vientiane Place, Washington DC  20521-4350

**telephone:** [856] 21-48-7000

**FAX:** [856] 21-48-7040

**email address and website:**
CONSLAO@state.gov

https://la.usembassy.gov/

**Flag description**

three horizontal bands of red (top), blue (double width), and red with a large white disk centered in the blue band; the red bands recall the blood shed for liberation; the blue band represents the Mekong River and prosperity; the white disk symbolizes the full moon against the Mekong River, but also signifies the unity of the people under the Lao People's Revolutionary Party, as well as the country's bright future

**National symbol(s)**

elephant; national colors: red, white, blue

**National anthem**

**name:** "Pheng Xat Lao" (Hymn of the Lao People)

**lyrics/music:** SISANA Sisane/THONGDY Sounthonevichit

**note:** music adopted 1945, lyrics adopted 1975; the anthem's lyrics were changed following the 1975 Communist revolution that overthrew the monarchy

**National heritage**

**total World Heritage Sites:** 3 (all cultural)

**selected World Heritage Site locales:** Town of Luangphrabang; Vat Phou and Associated Ancient Settlements; Megalithic Jar Sites in Xiengkhuang - Plain of Jars

## ECONOMY

**Economic overview**

lower middle-income, socialist Southeast Asian economy; one of the fastest growing economies; declining but still high poverty; natural resource rich; new anticorruption efforts; already high and growing public debt; service sector hit hard by COVID-19

**Real GDP (purchasing power parity)**

$58.264 billion (2021 est.)
$56.827 billion (2020 est.)
$56.543 billion (2019 est.)

**note:** data are in 2017 dollars
comparison ranking: 108

**Real GDP growth rate**

2.53% (2021 est.)
0.5% (2020 est.)
5.46% (2019 est.)

comparison ranking: 154

**Real GDP per capita**

$7,800 (2021 est.)
$7,800 (2020 est.)
$7,800 (2019 est.)

**note:** data are in 2017 dollars
comparison ranking: 156

**GDP (official exchange rate)**

$16.97 billion (2017 est.)

**Inflation rate** (consumer prices)

3.76% (2021 est.)
5.1% (2020 est.)
3.32% (2019 est.)
comparison ranking: 101

**Credit ratings**

**Fitch rating:** CCC (2020)

**Moody's rating:** Caa2 (2020)

**note:** The year refers to the year in which the current credit rating was first obtained.

**GDP - composition, by sector of origin**

**agriculture:** 20.9% (2017 est.)

**industry:** 33.2% (2017 est.)

**services:** 45.9% (2017 est.)
comparison rankings: services 195; industry 56; agriculture 44

**GDP - composition, by end use**

**household consumption:** 63.7% (2017 est.)

**government consumption:** 14.1% (2017 est.)

**investment in fixed capital:** 30.9% (2017 est.)

**investment in inventories:** 3.1% (2017 est.)

**exports of goods and services:** 34.6% (2017 est.)

**imports of goods and services:** -43.2% (2017 est.)

**Agricultural products**

rice, roots/tubers nes, cassava, sugar cane, vegetables, bananas, maize, watermelons, coffee, taro

**Industries**

mining (copper, tin, gold, gypsum); timber, electric power, agricultural processing, rubber, construction, garments, cement, tourism

**Industrial production growth rate**

7.61% (2021 est.)
comparison ranking: 56

**Labor force**

3.915 million (2021 est.)
comparison ranking: 97

**Labor force - by occupation**

**agriculture:** 73.1%

**industry:** 6.1%

**services:** 20.6% (2012 est.)

**Unemployment rate**

1.26% (2021 est.)
1.03% (2020 est.)
0.85% (2019 est.)

**Youth unemployment rate (ages 15-24)**

**total:** 3.3%

**male:** 3.4%

**female:** 3.2% (2021 est.)
comparison ranking: total 196

**Population below poverty line**

18.3% (2018 est.)

**Gini Index coefficient - distribution of family income**

38.8 (2018 est.)
comparison ranking: 64

**Average household expenditures**

**on food:** 50% of household expenditures (2018 est.)

**on alcohol and tobacco:** 10.5% of household expenditures (2018 est.)

**Household income or consumption by percentage share**

**lowest 10%:** 3.3%

**highest 10%:** 30.3% (2008)

**Budget**

**revenues:** $2.896 billion (2019 est.)

**expenditures:** $3.839 billion (2019 est.)

**Budget surplus (+) or deficit (-)**

-5.5% (of GDP) (2017 est.)
comparison ranking: 173

**Public debt**

63.6% of GDP (2017 est.)
58.4% of GDP (2016 est.)
comparison ranking: 72

**Taxes and other revenues**

18.3% (of GDP) (2017 est.)
comparison ranking: 108

**Fiscal year**

1 October - 30 September

**Current account balance**

$446.572 million (2021 est.)
-$230.973 million (2020 est.)
-$1.32 billion (2019 est.)
comparison ranking: 59

**Exports**

$7.82 billion (2021 est.) note: data are in current year dollars
$6.461 billion (2020 est.) note: data are in current year dollars
$6.985 billion (2019 est.)
comparison ranking: 117

Case 2:23-cv-02531-DJC-DB    Document 1    Filed 11/02/23    Page 85 of 126

**Exports - partners**

Thailand 36%, China 28%, Vietnam 16% (2019)

**Exports - commodities**

electricity, gold, paper, copper, rubber, flavored water (2021)

**Imports**

$6.527 billion (2021 est.) note: data are in current year dollars
$5.816 billion (2020 est.) note: data are in current year dollars
$7.518 billion (2019 est.)

comparison ranking: 130

**Imports - partners**

Thailand 53%, China 26%, Vietnam 10% (2019)

**Imports - commodities**

refined petroleum, cars, cattle, iron structures, steel products (2019)

**Reserves of foreign exchange and gold**

$1.476 billion (31 December 2021 est.)
$1.393 billion (31 December 2020 est.)
$1.111 billion (31 December 2019 est.)

comparison ranking: 139

**Debt - external**

$14.9 billion (31 December 2017 est.)
$12.9 billion (31 December 2016 est.)

comparison ranking: 103

**Exchange rates**

kips (LAK) per US dollar -

**Exchange rates:**
9,697.916 (2021 est.)
9,045.788 (2020 est.)
8,679.409 (2019 est.)
8,401.335 (2018 est.)
8,244.843 (2017 est.)


## ENERGY

**Electricity access**

**electrification - total population:** 100% (2021)

**Electricity**

**installed generating capacity:** 9.346 million kW (2020 est.)

**consumption:** 5,108,640,000 kWh (2019 est.)

**exports:** 24.114 billion kWh (2019 est.)

**imports:** 1.345 billion kWh (2019 est.)

**transmission/distribution losses:** 2.262 billion kWh (2019 est.)

comparison rankings: installed generating capacity 68; transmission/distribution losses 81; imports 67; exports 8; consumption 124

**Electricity generation sources**

Case 2:23-cv-02531-DJC-DB   Document 1   Filed 11/02/23   Page 86 of 126

**fossil fuels:** 35.6% of total installed capacity (2020 est.)

**nuclear:** 0% of total installed capacity (2020 est.)

**solar:** 0.1% of total installed capacity (2020 est.)

**wind:** 0% of total installed capacity (2020 est.)

**hydroelectricity:** 64.1% of total installed capacity (2020 est.)

**tide and wave:** 0% of total installed capacity (2020 est.)

**geothermal:** 0% of total installed capacity (2020 est.)

**biomass and waste:** 0.2% of total installed capacity (2020 est.)

Coal

**production:** 16.04 million metric tons (2020 est.)

**consumption:** 15.823 million metric tons (2020 est.)

**exports:** 235,000 metric tons (2020 est.)

**imports:** 18,000 metric tons (2020 est.)

**proven reserves:** 503 million metric tons (2019 est.)

Petroleum

**total petroleum production:** 0 bbl/day (2021 est.)

**refined petroleum consumption:** 19,300 bbl/day (2019 est.)

**crude oil and lease condensate exports:** 0 bbl/day (2018 est.)

**crude oil and lease condensate imports:** 0 bbl/day (2018 est.)

**crude oil estimated reserves:** 0 barrels (2021 est.)

**Refined petroleum products - production**

0 bbl/day (2015 est.)
comparison ranking: 111

**Refined petroleum products - exports**

0 bbl/day (2015 est.)
comparison ranking: 166

**Refined petroleum products - imports**

17,460 bbl/day (2015 est.)
comparison ranking: 131

Natural gas

**production:** 0 cubic meters (2021 est.)

**consumption:** 0 cubic meters (2021 est.)

**exports:** 0 cubic meters (2021 est.)

**imports:** 0 cubic meters (2021 est.)

**proven reserves:** 0 cubic meters (2021 est.)

**Carbon dioxide emissions**

40.726 million metric tonnes of $CO_2$ (2019 est.)

**from coal and metallurgical coke:** 37.871 million metric tonnes of $CO_2$ (2019 est.)

**from petroleum and other liquids:** 2.855 million metric tonnes of $CO_2$ (2019 est.)

**from consumed natural gas:** 0 metric tonnes of $CO_2$ (2019 est.)

comparison ranking: total emissions 63

**Energy consumption per capita**

73.187 million Btu/person (2019 est.)

comparison ranking: 81

## COMMUNICATIONS

**Telephones - fixed lines**

**total subscriptions:** 1,300,195 (2021 est.)

**subscriptions per 100 inhabitants:** 18 (2021 est.)

comparison ranking: total subscriptions 64

**Telephones - mobile cellular**

**total subscriptions:** 4,822,973 (2021 est.)

**subscriptions per 100 inhabitants:** 65 (2021 est.)

comparison ranking: total subscriptions 124

**Telecommunication systems**

**general assessment:** Laos joined the World Trade Organization (WTO) in 2013; one of the conditions of admittance was to establish an independent regulator for its telecom sector within two years; the government had committed to do so by February 2015 as part of the accession agreement; there still has been no sign of any firm plans being made to create an independent regulatory body; the Ministry of Technology and Communications retains the primary role in regulating the country's telecom market; with the government also having a financial stake (in part or in whole) in every one of the major fixed-line and mobile operators, the MPT's position and decision-making is far from what could be considered independent; sufficient returns on investment cannot be guaranteed with such strict pricing controls as well as the potential for political interference; fixed-line and mobile penetration levels have, as a result, remained much lower than what's seen in neighboring South East Asian markets; there are signs of growth in the mobile broadband segment as LTE network coverage slowly widens and, more recently, the country's first 5G services start to come on stream; residents in the capital will at least be able to enjoy high-speed services in the near future, while the rest of the country waits patiently to catch up with the rest of the world. (2022)

**domestic:** fixed-line nearly 18 per 100 and 65 per 100 for mobile-cellular subscriptions (2021)

**international:** country code - 856; satellite earth station - 1 Intersputnik (Indian Ocean region) and a second to be developed by China

**Broadcast media**

6 TV stations operating out of Vientiane - 3 government-operated and the others commercial; 17 provincial stations operating with nearly all programming relayed via satellite from the government-operated stations in Vientiane; Chinese and Vietnamese programming relayed via satellite from Lao National TV; broadcasts available from stations in Thailand and Vietnam in border areas; multi-channel satellite and cable TV systems provide access to a wide range of foreign stations; state-controlled radio with state-operated Lao National Radio (LNR) broadcasting on 5 frequencies - 1 AM, 1 SW, and 3 FM; LNR's AM and FM programs are relayed via satellite constituting a large part of the programming schedules of the provincial radio stations; Thai radio broadcasts available in border areas and transmissions of multiple international broadcasters are also accessible

**Internet country code**

.la

**Internet users**

**total:** 4.588 million (2021 est.)

**percent of population:** 62% (2021 est.)
comparison ranking: total 102

**Broadband - fixed subscriptions**

**total:** 128,000 (2020 est.)

**subscriptions per 100 inhabitants:** 2 (2020 est.)
comparison ranking: total 126

## TRANSPORTATION

**National air transport system**

**number of registered air carriers:** 1 (2020)

**inventory of registered aircraft operated by air carriers:** 12

**annual passenger traffic on registered air carriers:** 1,251,961 (2018)

**annual freight traffic on registered air carriers:** 1.53 million (2018) mt-km

**Civil aircraft registration country code prefix**

RDPL

**Airports**

41 (2021)
comparison ranking: total 104

**Airports - with paved runways**

8

**note:** paved runways have a concrete or asphalt surface but not all have facilities for refueling, maintenance, or air traffic control; the length of a runway required for aircraft to safely operate depends on a number of factors including the type of aircraft, the takeoff weight (including passengers, cargo, and fuel), engine types, flap settings, landing speed, elevation of the airport, and average maximum daily air temperature; paved runways can reach a length of 5,000 m (16,000 ft.), but the "typical" length of a commercial airline runway is between 2,500-4,000 m (8,000-13,000 ft.)

**Airports - with unpaved runways**

33

**note:** unpaved runways have a surface composition such as grass or packed earth and are most suited to the operation of light aircraft; unpaved runways are usually short, often less than 1,000 m (3,280 ft.) in length; airports with unpaved runways often lack facilities for refueling, maintenance, or air traffic control

**Pipelines**

540 km refined products (2013)

**Railways**

**total:** 422 km (2023)

**standard gauge:** 422 km (2023) 1.435-m gauge (422 km overhead electrification)
comparison ranking: total 120

**Roadways**

**total:** 39,586 km (2009)

**paved:** 5,415 km (2009)

**unpaved:** 34,171 km (2009)

Case 2:23-cv-02531-DJC-DB    Document 1    Filed 11/02/23    Page 89 of 126

**Waterways**

4,600 km (2012) (primarily on the Mekong River and its tributaries; 2,900 additional km are intermittently navigable by craft drawing less than 0.5 m)

comparison ranking: 26

**Merchant marine**

**total:** 1

**by type:** general cargo 1 (2022)

comparison ranking: total 184

## MILITARY AND SECURITY

### Military and security forces

Lao People's Armed Forces (LPAF): Lao People's Army (LPA, includes Riverine Force), Air Force, Self-Defense Militia Forces (2023)

**note:** the Ministry of Public Security maintains internal security and is responsible for law enforcement; it oversees local, traffic, immigration, and security police, village police auxiliaries, and other armed police units

### Military expenditures

0.2% of GDP (2019 est.)
0.2% of GDP (2018 est.)
0.2% of GDP (2017 est.)
0.2% of GDP (2016 est.)
0.2% of GDP (2015 est.)

comparison ranking: 166

### Military and security service personnel strengths

limited and varied information; estimated 30,000 active-duty troops (26,000 Army; 4,000 Air Force) (2023)

### Military equipment inventories and acquisitions

the LPAF is armed largely with Soviet-era weapons; in recent years, China and Russia have been the leading suppliers of military equipment to Laos (2023)

### Military service age and obligation

18 years of age for compulsory or voluntary military service; minimum 18-month service obligation (2023)

### Military - note

the LPAF's primary missions are border and internal security, including counterinsurgency and counterterrorism; the Army is organized into a few small divisions and independent regiments deployed around the country in four military regions; the Army is supported by a self-defense militia, which is estimated to be 100,000 strong; the small Air Force does not have any combat aircraft

Vietnam is the military's primary security partner, although in recent years, Laos has expanded defense ties with China and Russia (2023)

## TRANSNATIONAL ISSUES

### Disputes - international

*Laos-Burma:* none identified

*Laos-Cambodia:* in 2021, the two countries agreed to increase efforts to combat drug trafficking and other transnational crimes and to complete the last 14% of their border demarcation

*Laos-Cambodia-Vietnam:* Cambodia and Vietnam are concerned about Laos' extensive plans for upstream dam construction and the potential harm it poses to fisheries and farming downstream

*Laos-China:* concern among Mekong River Commission members that China's construction of eight dams on the Upper Mekong River and construction of more dams on its tributaries will affect water levels, sediment flows, and fisheries

Case 2:23-cv-02531-DJC-DB   Document 1   Filed 11/02/23   Page 90 of 126

*Laos-Thailand:* talks continue as of 2018 on completion of demarcation with Thailand but disputes remain over islands in the Mekong River

Laos-Vietnam: Laos and Vietnam completed border demarcation in 2016

## Illicit drugs

Laos remains a key transit route for drug trafficking and the movement of precursor chemicals; opium produced is typically smuggled out of the country and refined elsewhere and not trafficked in significant quantities to the United States

Case 2:23-cv-02531-DJC-DB   Document 1   Filed 11/02/23   Page 91 of 126

All Foreign Governments

# Laos

# Leaders and Cabinet Members

**Last Updated**: 2/2/2023

Lao officials are addressed by the first element in their names.

## Pres.

THONGLOUN Sisoulit

## Vice Pres.

PANI Yathotou

## Vice Pres.

BOUNTHONG Chitmani

## Prime Min.

SONXAI Siphandon

## Dep. Prime Min.

CHANSAMON Chan-gnalat, *Gen.*

**Dep. Prime Min.** 2:23-cv-02531-DJC-DB Document 1 Filed 11/02/23 Page 92 of 126

KIKEO Khaikhamphithoun

## Dep. Prime Min.

VILAI Lakhamfong

## Dep. Prime Min.

SALEUMXAI Kommasit

## Min. of Agriculture & Forestry

PHET Phomphiphak

## Min. of Education & Sports

PHOUT Simmalavong

## Min. of Energy & Mining

PHOXAI Xai-gnason

## Min. of Finance

SANTIPHAP Phomvihan

## Min. of Foreign Affairs

SALEUMXAI Kommasit

## Min. of Home Affairs

THONGCHAN Manixai

# Min. of Industry & Commerce

MALAITHONG Kommasit

## Min. of Information, Culture, & Tourism

SOUANSAVAN Vi-gnaket

## Min. of Justice

PHAIVI Siboualipha

## Min. of Labor & Social Welfare

BAIKHAM Khatthi-gna

## Min. of National Defense

CHANSAMON Chan-gnalat, *Gen.*

## Min. of Natural Resources & Environment

BOUNKHAM Volachit

## Min. of Planning & Investment

KHAMCHEN Vongphosi

## Min. of Public Health

BOUNFENG Phoummalaisit

## Min. of Public Security

VILAI Lakhamfong

## Min. of Public Works & Transport

NGAMPASONG Muangmani

## Min. of Technology & Communication

BOVIANGKHAM Vongdala

## Min. to the Prime Minister's Office & Head, Prime Minister's Office

ALOUNXAI Sounnalat

## Min. to Prime Minister's Office

KHAMPHENG Xaisompheng

## Min. to Prime Minister's Office

SONXAI Sitphaxai

## Min. & Head of Cabinet, President's Office

KHEMMANI Phonsena

## Chmn., State Inspection Ctte.

KHAMPHAN Phommathat

## Governor, Bank of Laos

BOUNLUA Sinxaivolavong

## Ambassador to the US

SISAVAT

# Permanent Representative to the UN, New York

ANOUPHAP Vongnokeo



# Explore Foreign Governments

Search over 195 governments throughout the world.

Try Albania, Colombia, or Indonesia.



# Exhibit B

LORETTA E. LYNCH
United States Attorney General
BRIAN J. STRETCH (CSBN 163973)
Acting United States Attorney
ALEX G. TSE (CSBN 152348)
Chief, Civil Division
REBECCA A. FALK (CSBN 226798)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7022
     FAX: (415) 436-6748
     rebecca.falk@usdoj.gov

Attorneys for Federal Defendant
UNITED STATES OF AMERICA
AND STEVEN DECKER

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NHIA KAO VANG, CHAO XIONG, DAVID VANG, CHONG YANG, CHUE HUE VANG, PANG HER, | CASE NO. C 12-1226 MCE-EFB |
|     Plaintiffs, | FEDERAL DEFENDANT'S RESPONSE TO COURT ORDER FOR BRIEFING (DKT. NO. 48) |
|   v. | |
| STEVEN DECKER et al, | |
|     Defendant. | |

## I.    INTRODUCTION

The Ninth Circuit affirmed this Court's dismissal with prejudice of all claims and federal defendants in this action except malicious prosecution. *Vang v. Decker*, 607 Fed.Appx. 728 (9th Cir. 2015). Plaintiffs' case now consists only of a malicious prosecution claim against the United States pursuant to the Federal Tort Claims Act and against Special Agent Steven Decker pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[1] On August 20, 2015, this Court, pursuant to the Ninth Circuit's instructions on remand, ordered Defendants to address whether the charges in the underlying criminal prosecution, *United States v. Harrison Jack, et al*, E.D. Cal., Case No. CR 07-266 FCD ("*Jack*"), were withdrawn on the basis of a compromise among the parties or for a cause that was not inconsistent with Plaintiffs' guilt.[2] Dkt. No. 48.

As demonstrated in the accompanying declaration of United States Attorney Benjamin B. Wagner ("Wagner Decl."), despite probable cause and evidence that Nhia Kao Vang, David Vang and Chue Hue Vang (the "Vang Plaintiffs")[3] committed the remaining crimes with which they were charged, the United States dismissed the *Jack* prosecution based on factors unrelated to the merits. Through its rulings and comments, the court revealed a remarkable hostility to the government's case. *See* Wagner Decl., ¶ 4. The criminal defendants also alleged agent and prosecutorial misconduct, raising a risk of a negative credibility finding and suppression of evidence. *See id*. at ¶ 5-6. Going forward, the case would require a significant number of personnel, trial would be fiercely contested and any sentences imposed would likely be low. *See id*. at ¶ 7-8. As a result, U.S. Attorney Wagner weighed the costs and benefits of pursuing the case, and determined that no substantial federal interest was served by continued prosecution. *See id*.at ¶ 3, 9. None of these reasons for dismissal, however, are inconsistent with the guilt of the Vang Plaintiffs. Accordingly, Plaintiffs cannot maintain a claim for malicious prosecution.

///

---

[1] This Court deferred ruling on Agent Decker's entitlement to qualified immunity. Dkts. No. 32; 38 at 15, n. 5. If necessary, he will raise this issue in a noticed motion.

[2] On April 8, 2013, this Court took judicial notice of the *Jack* docket. *See* Dkt. No. 32-2; 38.

[3] Plaintiffs Chao Xiong, Chong Yang and Pang Her were never prosecuted in the *Jack* case.

II.     **ARGUMENT**

    A.     **Dismissal of the *Jack* Prosecution Was Not Inconsistent With Guilt**

       In June, 2007, the United States charged 11 individuals, including the Vang Plaintiffs, with numerous counts arising from an alleged conspiracy to overthrow the government of Laos.  Cr. Dkt. No. 3.  A First Superseding Indictment was filed in 2009, after which General Vang Pao was dismissed, and a Second Superseding Indictment followed in June, 2010.  *Id*. at 460, 464, 578.

       In December, 2010, after three years of litigation, U.S. Attorney Wagner recommended dismissal of the *Jack* prosecution to the United States Department of Justice's National Security Division ("NSD") because, given the circumstances, no substantial federal interest would be served by continued prosecution.  *See* Declaration of Benjamin B. Wagner ("Wagner Decl."), ¶ 3.  U.S. Attorney Wagner made this recommendation, as a discretionary matter, for a combination reasons, including the following.  *Id*.

       First, the court made a series of adverse rulings, vigorously opposed by the United States, suggesting it was markedly hostile to the government's case.  *See* Wagner Decl., ¶ 4.  At the same time, the court gave defendants extraordinary leeway in litigating the case.  *Id*.  During a status conference on February 23, 2009, counsel for the defendants alleged that the government had engaged in outrageous conduct, and asked the court to recommend that the Attorney General review the case.  *Id*. at ¶ 4a.  The court did so based on the representations of defense counsel alone, and over the government's strenuous objections.  *Id*.  During oral argument on October 15, 2010, on the question of whether the various charges, as pled, stated claims for relief, the court suggested that the government had "orchestrated" the coup plot.  *Id*. at ¶ 4b.

       On November 12, 2010, the court dismissed without prejudice over one-half of the government's charging theories.  *Id*. at ¶ 4c, Cr. Dkt No. 671.  The court held that the Second Superseding Indictment failed "to put each defendant on notice of the nature of charges against him," and further failed to notify each defendant of "the specific conduct he engaged in that allegedly violates the [Neutrality] Act."  Cr. Dkt No. 671.  The court dismissed three conspiracies charged in Count One (to transfer machine guns, receive/possess destructive devices and export listed defense items), Count Four (conspiracy to transfer explosives) and Count Five (Neutrality Act violation).  *Id*.  The remaining charges were:  Count One

1    (conspiracy to violate the Neutrality Act), Count Two (conspiracy to commit murder and damage

2    property abroad), and Count Three (conspiracy to receive and possess Stinger missiles).  *Id.*

3            The court also scheduled up to two weeks of evidentiary hearings, commencing in late February,

4    2011, as to the defendants' motions to: (1) Suppress Fruits of Illegal Wiretaps; (2) Dismiss for

5    Outrageous Government Conduct; (3) Suppress Evidence Obtained Pursuant to Execution of Search

6    Warrants; and (4) Suppress Evidence Gathered as a Result of False Affidavits Supporting Search

7    Warrants.  Wagner Decl. at ¶ 4d; *see also* Cr. Dkt. No. 614, 615.  The government opposed each motion

8    and strenuously objected to this *Franks* hearing because the criminal defendants failed to make the

9    requisite preliminary showing.  *Id.*, *see also* Cr. Dkt. No. 606.  The criminal defendants alleged well

10   over one-hundred *Franks* violations as well as outrageous conduct by the undercover agent, other

11   affiants and prosecutors.  *Id.*  The court granted the defendants' request for an evidentiary hearing on all

12   violations, even though many were unsubstantiated and/or wholly immaterial, and refused the

13   government's repeated requests to limit the hearing to only those claims for which a preliminary *Franks*

14   showing was made.  *Id.*  The hearings would have required the testimony of several law enforcement

15   personnel, one current and one former prosecutor.  *Id.*

16           Second, the criminal defendants alleged the wiretap, search warrant and complaint affidavits

17   submitted by the undercover agent contained incriminating statements falsely attributed to former

18   defendant General Vang Pao, and failed to disclose certain facts.  *See* Wagner Decl., ¶ 5.  Although

19   U.S. Attorney Wagner believed the agent acted in good faith, he had never testified in a contested court

20   hearing or trial.  *Id.*  The upcoming *Franks* hearing raised the possibility that the agent would be subject

21   to vigorous cross-examination regarding his alleged errors, the criminal defendants would suggest he

22   was unreliable among other things, and the court would enter a negative credibility finding, especially

23   given its previous expressed views about the case.  *Id.*  Because this agent was a critical prosecution

24   witness, such a finding would be damaging beyond its impact on the pretrial motions.  *Id.*

25           Third, the criminal defendants alleged that the prosecutors engaged in misconduct.  *See* Wagner

26   Decl. at ¶ 6.  Although U.S. Attorney Wagner believed that all personnel acted in good faith, prosecutors

27   and agents inadvertently committed a technical violation of the 60-day search warrant deadline relating

28   to computer searches.  *Id.*  This inadvertent error created a risk of suppression.  *Id.*

1    Fourth, the United States faced a fiercely contested trial and considerable litigation on

2    evidentiary issues.  *See* Wagner Decl. at ¶ 7.

3    Fifth, even if the United States prevailed, the court was likely to impose minimal sentences.  *See*

4    Wagner Decl. at ¶ 8.

5    Finally, taking all of these factors into consideration. U.S. Attorney Wagner performed a

6    cost/benefit analysis.  *See* Wagner Decl. at ¶ 9.  The *Jack* prosecution required the dedicated efforts of

7    three AUSAs, including one who was in a supervisory role, two trial attorneys from NSD and a number

8    of agents and translators.  *Id.*  It would likely continue to require this level of resources for years to

9    come.  *Id.*  U.S. Attorney Wagner determined that the benefits of further prosecution were outweighed

10   by the costs and risks.  *Id.*

11   On January 10, 2011, the government moved "to dismiss the counts in the indictment, first

12   superseding indictment and second superseding indictment as against all defendants, in the interests of

13   justice."  Cr. Dkt No. 687, 688.  The court granted the motion on the same day, dismissing all counts and

14   closing the criminal case.  *Id.*, *see also* Wagner Decl. at ¶ 10.

15       **B.    Plaintiffs Cannot Maintain a Malicious Prosecution Action**

16   Plaintiffs cannot maintain a malicious prosecution action because the *Jack* prosecution was

17   dismissed for reasons not inconsistent with the Vang Plaintiffs' guilt.  Under California law, an action

18   for malicious prosecution requires a plaintiff to establish that "the underlying prosecution: (1) was

19   commenced by or at the direction of the defendant and terminated in [the plaintiff's] favor; (2) was

20   brought without probable cause; and (3) was initiated with malice."  *Conrad v. United States*, 447 F.3d

21   760, 767 (9th Cir. 2006) (quoting *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863 (1989)).  An

22   action for malicious prosecution under *Bivens* requires the plaintiff to show tortious conduct under the

23   elements of state law, and the intent to deprive the individual of a constitutional right.  *Awabdy*, 368

24   F.3d at 1066.

25   To establish that the prosecution terminated in his favor, a plaintiff must "generally establish that

26   the prior proceedings terminated in such a manner as to indicate his innocence."  *Awabdy*, 368 F.3d at

27   1068.  If, however, a dismissal is based "on technical grounds, for procedural reasons, or for any reason

28   not inconsistent with his guilt, it does not constitute a favorable termination."  *Jaffe v. Stone*, 18 Cal.2d

146, 150 (1941). Whether there was a favorable termination is a legal issue for the court to decide. *See Sierra Club Found. v. Graham*, 72 Cal. App. 4th 1135, 1149 (1999).

A dismissal in the interests of justice can be construed as a favorable termination if "it reflects the opinion of the prosecuting party or the court that the action lacked merit or would result in a decision in favor of the defendant." *Awabdy*, 368 F.3d at 1068. Further,

> [w]hen such a dismissal is procured as the result of a motion by the prosecutor and there are allegations that the prior proceedings were instituted as the result of fraudulent conduct, *a malicious prosecution plaintiff is not precluded from maintaining his action unless the defendants can establish that the charges were withdrawn on the basis of a compromise among the parties or for a cause that was not inconsistent with his guilt.*

*Id*. (emphasis added). The Ninth Circuit held that because Plaintiffs alleged misconduct in the *Jack* case, and the United States dismissed *Jack* "in the interests of justice" instead of refiling the dismissed counts in an amended or superseding indictment, the burden shifted to Defendants "to show that the proceedings did not terminate as a result of Plaintiffs' innocence." *Vang*, 607 Fed. Appx. at 729.

As demonstrated by U.S. Attorney Wagner's declaration, the United Stated did not dismiss the *Jack* prosecution because the remaining charges against the Vang Plaintiffs lacked merit. The United States had evidence that the Vang Plaintiffs had committed the remaining crimes with which they were charged, and made no compromise to dismiss them. *See* Wagner Decl., ¶ 11, 12. Instead, it ended the prosecution because the costs of pursuing the *Jack* case outweighed the benefits. *Id*. at ¶ 3-9, *see also Deal v. Alegre*, 2006 WL 436144 at *4 (N.D. Cal. Feb. 21, 2006) (a dismissal in the interests of justice was not inconsistent with guilt where an essential witness was unavailable, the accused had served his sentence and had a prior conviction). Accordingly, the dismissal was not inconsistent with the Vang Plaintiffs' guilt, and as a result, Plaintiffs cannot maintain a malicious prosecution action.

## III. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court hold that the *Jack* case was dismissed for reasons that were not inconsistent with the Vang Plaintiffs' guilt.

DATED: September 3, 2015

BRIAN J. STRETCH
United States Attorney

By:      /s/ Rebecca A. Falk
REBECCA A. FALK
Assistant United States Attorney

1   LORETTA E. LYNCH
    United States Attorney General
2   BRIAN J. STRETCH (CSBN 163973)
    Acting United States Attorney
3   ALEX G. TSE (CSBN 152348)
    Chief, Civil Division
4   REBECCA A. FALK (CSBN 226798)
    Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7022
7       FAX: (415) 436-6748
        rebecca.falk@usdoj.gov
8
    Attorneys for Federal Defendants
9   UNITED STATES OF AMERICA
    AND STEVEN DECKER
10

11                          UNITED STATES DISTRICT COURT

12                          EASTERN DISTRICT OF CALIFORNIA

13

14  NHIA KAO VANG, CHAO XIONG, DAVID    )  CASE NO. C 12-1226 MCE-EFB
    VANG, CHONG YANG, CHUE HUE VANG,    )
15  PANG HER,                           )  DECLARATION OF UNITED STATES
                                        )  ATTORNEY BENJAMIN B. WAGNER IN
16       Plaintiffs,                    )  SUPPORT OF FEDERAL DEFENDANTS'
                                        )  RESPONSE TO COURT ORDER FOR BRIEFING
17  v.                                  )  (DKT. NO. 48)
                                        )
18  STEVEN DECKER et al,                )
                                        )
19       Defendants.                    )
20

21              **DECLARATION OF BENJAMIN B. WAGNER**

22          I, Benjamin B. Wagner, pursuant to 28 U.S.C. § 1764, declare and state as follows:

23          1.      I am the United States Attorney for the Eastern District of California. I have served in

24  this position since November 9, 2009. Based on my role as the United States Attorney for the Eastern

25  District of California, and based on my review of certain documents in our office's file regarding *United*

26  *States v. Harrison Jack, et al*, Eastern District of California, Case No. CR 07-266 FCD ("*Jack*"), I have

27  personal knowledge of the facts stated in this declaration, and if called and sworn as a witness, I could

28  and would testify as set forth herein.

    DECLARATION OF WAGNER ISO FEDERAL DEFENDANTS' RESPONSE TO DKT. NO. 48        1
    12-01226 MCE-EFB

2.      Although I was in the U.S. Attorney's Office for the Eastern District of California as a supervisory AUSA prior to November 2009, I had no role in the investigation or prosecution of the *Jack* case prior to becoming U.S. Attorney. After becoming U.S. Attorney, I became involved in the oversight of the case.

3.      In my capacity as the United States Attorney for the Eastern District of California, on or about December 3, 2010, after careful consideration of the case as a whole and consultation with members of the prosecution team and other experienced criminal supervisors in my office, I recommended dismissal of the *Jack* criminal prosecution to the National Security Division ("NSD") of the United States Department of Justice. I made this recommendation because I concluded that no substantial federal interest would be served by continued prosecution. I recommended dismissal, as a discretionary matter, for a combination of reasons, including factual information as well as my mental impressions, conclusions, opinions, and legal theories. Factual information that I considered in my recommendation for dismissal of the *Jack* prosecution includes, but is not limited to, the following.

4.      First, the district court made a series of adverse rulings, which we vigorously opposed, suggesting that it was markedly hostile to the government's case. At the same time, the district court gave the defense extraordinary leeway in litigating the case.

a.      During a status conference on February 23, 2009, counsel for the criminal defendants orally alleged that the government had engaged in outrageous conduct, and asked the court to recommend that the Attorney General review the case. The court did so based on the representations of defense counsel alone, and over the government's strenuous objections.

b.      During oral argument on October 15, 2010, on the legal question of whether the various charges, as pled, stated claims for relief, the court, when questioning government counsel, suggested that the government had "orchestrated" the coup plot.

c.      On November 12, 2010, the court dismissed over one-half of the government's charging theories. As a result, the operative indictment included three remaining charges: Count One (conspiracy to violate the Neutrality Act), Count Two (conspiracy to commit murder and damage property abroad) and Count Three (conspiracy to receive and possess Stinger missiles).

d.      The court scheduled up to two weeks of evidentiary hearings, to commence

February 28, 2011, related to defense motions to dismiss and suppress. The criminal defendants alleged well over one-hundred *Franks* violations as well as other outrageous conduct by the undercover agent, other affiants and prosecutors. Although many of the claimed violations were unsubstantiated and/or wholly immaterial, the court granted the defendants' request for an evidentiary hearing on all one-hundred plus purported *Franks* violations and claims of misconduct, and refused the government's repeated requests to limit the hearing to only those claims for which a substantial preliminary *Franks* showing, including materiality, was made. The hearings would require the testimony of several law enforcement personnel and of one current and one former prosecutor.

5.      Second, the criminal defendants alleged the wiretap affidavits, search warrant affidavits, and complaint affidavit submitted by the undercover agent contained incriminating statements falsely attributed to former defendant General Vang Pao, and failed to disclose certain facts. Although I believe that the agent acted in good faith, he had never before testified in a contested court hearing or trial. The upcoming *Franks* hearing raised the possibility that the agent would be subjected to vigorous cross-examination regarding his alleged errors, that the criminal defendants would suggest the agent was unreliable among other things, and that the district court would enter a negative credibility finding, particularly given the court's previously expressed views about the case. Because this agent was a critical witness for the prosecution, such a finding would be damaging beyond its impact on the pending pretrial motions.

6.      Third, the criminal defendants also alleged that the lead prosecutors engaged in prosecutorial misconduct during the investigation and during bail and discovery hearings. Again, although I believe that all personnel acted in good faith, prosecutors and agents inadvertently committed a technical violation of the 60-day search warrant deadline relating to computer searches, which created a risk of suppression.

7.      Fourth, the United States faced a fiercely contested trial against numerous defendants and considerable litigation on evidentiary issues.

8.      Fifth, even if the United States prevailed at trial, we concluded that the court was very likely to impose minimal sentences on convicted defendants.

9.      Finally, taking all of the foregoing factors into consideration, I performed a cost-benefit analysis.  The prosecution of the *Jack* case required the dedicated efforts of three AUSAs from the Eastern District of California, including a supervisory AUSA, two trial attorneys from NSD and a number of agents and translators.  This was a commitment that would continue for years to come, and would likely result in minimal sentences even if successful.  I concluded that the benefits of further prosecution were outweighed by the costs and risks.

10.      It is my understanding that after receiving my recommendation, NSD authorized dismissal of the *Jack* prosecution, and that the United States' motion to dismiss was granted in January, 2011.

11.      It is my understanding that there was probable cause that Nhia Kao Vang, David Vang and Chue Hue Vang (collectively referred to as the "Vang Plaintiffs") committed the remaining crimes with which they were charged and that our office had grounds to continue the *Jack* prosecution.

12.      The reasons for which I recommended dismissal of the charges in the *Jack* prosecution were not inconsistent with the guilt of the Vang Plaintiffs.  To the contrary, it is my understanding that the United States had evidence that the Vang Plaintiffs committed the remaining crimes for which they were charged.

13.      The *Jack* prosecution was not dismissed because of a compromise between the United States and the Vang Plaintiffs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___1st___ day of September , 2015.

BENJAMIN B. WAGNER

# Exhibit C

CALIFORNIA COURT OF APPEALS
FOR THE NINTH CIRCUIT

NHIA KAO VANG, CHAO XIONG,
DAVID VANG, CHONG YANG,
CHUE HUE VANG, and PANG HER

        Plaintiff,

      v.

STEVEN DECKER, B. TODD JONES,
AND THE UNITED STATES OF AMERICA.
Defendants

                         /

Case No. 16-15443
US District Court Case No.
2:12-cv-01226-MCE-EFB

---

**APPELLANTS' OPENING BRIEF**

---

**ON APPEAL FROM FEBRUARY 23, 2016 ORDER OF THE UNITED
STATES DISTRICT COURT, EASTERN DISTRICT OF
CALIFORNIA, HONORABLE MORRISON C. ENGLAND JR.
JUDGE PRESIDING**

---

Herman Franck, Esq. (SBN. 123476)
Elizabeth Betowski, Esq. (SBN. 245772)
FRANCK & ASSOCIATES
1801 7th Street, Suite 150
Sacramento, California 95814
Telephone (916) 447-8400
Facsimile (916) 447-0720
*Attorney for Appellants Nhia Kao Vang,
David Vang, Chue Hue Vang*

**TABLE OF CONTENTS**

0

I. SUMMARY OF PROCEEDINGS ON REMAND………………….....4

II. SUMMARY OF ARGUMENT…………………..………………...11

III. EVIDENCE SHOWN BY US ATTORNEY'S STATEMENT OF
REASONS FOR DISMISSING THE REMAINING PORTIONS OF THE
UNDERLYING CRIMINAL ACTION……..………………….…..……15

IV. STATEMENT OF THE CASE……………………………….....…18

V. STATEMENT OF APPEALABILITY………………..……...……...20

VI. STANDARD OF REVIEW…………………………..…………...22

VII. ISSUES ON APPEAL………………...…………………………23

VIII. SUMMARY OF TRIAL COURTS FINDINGS……………..…….24

IX. ARGUMENT…………..……………………………………….26

    A. The Trial Court Abused its Discretion in Denying the Motion to
    Open/Permit Discovery…..…………………………………….26

    B. The Trial Court Committed Prejudicial Error in Ordering the
    Dismissal of the Malicious Prosecution Actions …………..……....31

    C. The Court Abused its Discretion and/or Committed Prejudicial
    Error in not Allowing a Malicious Prosecution as to at least those
    Claims there were Involuntarily Dismissed...………………….....35

    D. Plaintiffs have Sustained Their Burden of Showing Prejudicial
    Error...........................................................................................39

X. CONCLUSION………………………………………….…..….…39

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986)............. 18, 23, 35

*B&G Enters., Ltd. v. United States,* 220 F.3d 1318, 1322 (11th Cir. 2000)...................................................................................22

*Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)...........................28

*Convertino v. DOJ*, 684 F.3d 93, 99 (D.C. Cir. 2012)... ..................27-28

*Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F.3d 861, 870-72 (9th Cir. 2004)...................................................22

*Disabled Rights Action Committee*, 375 F.3d at 870...........................22

*Elliot v. White Mountain Apache Tribal Court*, 566 F.3d 842, 846 (9th Cir. 2009)...................................................................................22

*Ex Parte Young,* 209 U.S. 123 (1908)...........................................4

*Garrett v. City & Cnty. of San Francisco*, 818 F.2d 1515, 1518 (9th Cir. 1987)......................................................., 23, 27, 34

*Montes v. United States*, 37 F.3d 1347, 1350 (9th Cir. 1994)...............22

*National Distrib. Agency v. Nationwide Mut. Ins. Co.*, 117 F.3d 432, 433 (9th Cir. 1997)...........................................................22

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)......................28

*Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1313 (11th Cir. 1999).............22

*Will v. Hallock*, 546 U.S. 345, 349-50 (2006)...........................20-21

## CALIFORNIA CASES

*Fuentes v. Berry* (1995) 38 Cal.App.4th 1800, 1808…………...………….11

*Singleton v. Perry* (1955) <u>45 Cal. 2d 489</u>, 497-498………...………...37-38

*Staffpro Inc. v. Elite Show Services, Inc.* (2006) 136 Cal.App. 4th 1392, 1402-1403......................................................................................12-14

*Weaver v. Superior Court* (1979) 95 Cal.App.3d 166, 185…………......11

## FEDERAL CONSTITUTIONAL AUTHORITIES

Due Process Clause…………………………………….……………………26

## FEDERAL STATUTES AND RULES

FRCP Rule 56(d)……………………………………………....…….27

FRCP Rule 61…………………………………………………………39

## OTHER AUTHORITIES.

Edward Brunet, *The Timing of Summary Judgment*, 198 F.R.D. 679, 687 (2001)……………………………………………………………….28

Appellants Nhia Kao Vang, David Vang, Chue Hue Vang, Pang Her

herewith submit this Appellants' Opening Brief.

# I.
## SUMMARY OF PROCEEDINGS ON REMAND

The Plaintiffs/Appellants assert a Federal Tort Claims Act and *Bivens* complaint against defendants USA and Mr. Stephen Decker, AFTE special agent, and request injunctive relief per *Ex Parte Young,* 209 U.S. 123 (1908) against the Director of the AFTE, defendant B. Todd Jones. This Court previously agreed on plaintiffs' first appeal that the complaint alleged the required elements of claims based on malicious prosecution of the underlying criminal case brought against plaintiffs.

This Court stated in its decision reversing the previous order granting defendants motion to dismiss per FRCP Rule 12(b)(6) [See CT 45, USCA Judgment, pages 2-4]:

> "Our focus here is Plaintiffs' malicious prosecution claims. We review de novo the dismissal of these claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011). "To prove a [FTCA] claim of malicious prosecution in California, the plaintiff must prove that the underlying prosecution: '(1) was commenced by or at the direction

4

of the defendant and was pursued to a legal termination in his,

plaintiff's, favor; (2) was brought without probable cause; and (3) was

initiated with malice.'" *Conrad v. United States*, 447 F.3d 760, 767

(9th Cir. 2006) (quoting *Sheldon Appel Co. v. Albert & Oliker*, 765

P.2d 498, 501 (Cal. 1989)); see also *Awabdy v. City of Adelanto*, 368

F.3d 1062, 1066 (9th Cir. 2004) (identical in the § 1983 context);

*Martin v. Sias*, 88 F.3d 774, 775 (9th Cir. 1996) (applying the same

standard in the *Bivens* context, save for the replacement of a state

actor with a federal actor). The entire action must terminate in a

plaintiff's favor in order for a plaintiff to maintain a claim for

malicious prosecution. *Crowley v. Katleman*, 881

P.2d 1083, 1094 (Cal. 1994). The district court concluded that

Plaintiffs had not met their burden of showing that the prosecution

terminated in their favor. Our precedent forecloses the district court's

conclusion.

In order for a plaintiff to prove that the prosecution terminated in his

favor,

he "must generally establish that the prior proceedings terminated in

such a manner as to indicate his innocence." *Awabdy*, 368 F.3d at

1068 (citations omitted). "[A] dismissal in the interests of justice

5

satisfies this requirement if it reflects the opinion of the prosecuting party or the court that the action lacked merit or would result in a decision in favor of the defendant." *Id*. Further, [w]hen such a dismissal is procured as the result of a motion by the prosecutor and there are allegations that the prior proceedings were instituted as the result of fraudulent conduct, *a malicious prosecution plaintiff is not precluded from maintaining his action unless the defendants can establish that the charges were withdrawn on the basis of a compromise among the parties or for a cause that was not inconsistent with his guilt. Id*. (emphasis added).

Plaintiffs' complaint plainly alleged misconduct in the underlying criminal matter, namely, that Defendant Decker lied to prosecutors and the grand jury. The district court in that case dismissed a number of the counts in the indictment for failing to put the Vang Plaintiffs on notice of the charges against them. Thereafter, instead of re-filing the dismissed counts in an amended or superseding indictment, the United States filed a motion—that the district court granted—to dismiss the surviving charges "in the interests of justice."

6

Plaintiffs/Appellants have the following offer of proof as to their factual innocence: that at all times when they were approached through Special Agent Stephen Decker of AFTE to engage in a military take over of Laos, and were asked to prepare a strategy document known as the POPCORN document, that defendants had stated the military strategy and plan to overtake Laos was part of an official USA military effort, and that participating in such an effort would thereby be 100% legal. The Hmong history is replete with previous requests by the USA to Hmong people to fight secret battles in Laos. See Plaintiffs' Request for discovery, CT 50 (requesting discovery in the form of depositions of Lt. Harrison Jack and AFTE Special Agent Decker, and including in that request an offer of proof of how the testimony of these witnesses would better establish plaintiff's factual innocence of the underlying charges. See also plaintiffs' motion for an initial scheduling conference, which restated this offer of proof, CT 51. And see Reply brief in support of motion, wherein the details of plaintiffs offer of proof were stated, CT 53.

Following remand of this action, the District Court issued an Order requiring the United States Attorneys Office to submit a declaration describing the

7

reasons they decided to dismiss the remaining half or so of the underlying criminal case.

Plaintiffs attempted to obtain a regular initial scheduling conference, trial setting, and opening of discovery, but the court did not allow it. See plaintiffs' motion for an initial scheduling conference, which restated this offer of proof. CT 51. And see reply brief in support of motion, wherein the details of plaintiffs offer of proof were stated, CT 53.

Plaintiffs submitted opposition papers explaining that the US Attorney's office declaration is a pre text for the real reason: the US Attorney's office knew the defendants in the underlying action were innocent.

Plaintiffs are Hmong advocates for justice for the atrocities being committed against them in Laos, both past and present. The Hmong people paid dearly for their willingness to enroll as soldiers in the United States CIA secret war in Laos. After the United States brokered/strong armed a peace treaty [1972], the USA pulled out of Indo China, including Laos, and left the Hmong to the murderous rapists' communist party who took over. There

8

was a genocide in Laos caused by the Laos Communist regime, who hunted down Hmong people like animals.

For some reason the USA, through an AFTE special agent Decker, decided to approach the Hmong advocates such as plaintiffs here, and asked them to once again come to the aid of the USA to fight a secret war in Laos. It was a repeat performance of what happened before. And as before, Hmong advocates were willing to assist the USA in any way it requested. The USA requested a document, known as the POPCORN document, to lay out a plan to overthrow the communist regime in Laos. A plan was proposed by Decker to take stinger and other missiles from Iraq and bring them to Thailand for free of charge [zero for transportation, zero for the missiles, zero for all]. The missiles and other weapons would await pick up by Hmong advocates, and snuck into Laos by foot transport. Once in Laos, they would then continue this walk into Vintienne, where they would execute the POPCORN military plan and overthrow the communist regime.

It should be noted that the Hmong team of what later became defendants in the criminal action where largely a group of ordinary people engaged in

9

# Exhibit D

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA
## 16-CR-167(SRN )

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SENG XIONG, | ) |
| | ) |
| Defendant. | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DECLARATION OF RECIPIENT OF USA PAYMENT OF SO-CALLED

RESTITUTION

I _Cher Pao Xiong_ hereby declares and states under oath and under penalty of perjury as follows:

1. I have personal knowledge of the matters stated in this declaration based on my direct involvement in these matters

2. I recently received a check from the United States government purporting to be restitution as a result of the USA's case against Seng Xiong [United States District Court, District of Minnesota Case No. 16-CR-167(SRN)] from the funds collected by Hmong Tebchaws. I wish to return these funds back to the USA and with Declaration of Recipient
instructions to keep all those funds together so that Hmong Tebchaws may use those monies to purchase lands to be arranged for hopefully in Thailand, but somewhere on this Earth that we will then call a Hmong homeland.

3. I am not a victim of any sort in this case. At no time did I believe or ever say that Seng Xiong somehow tricked or defrauded me.

4. I request that the monies be put back into Mr. Xiong's account in his name, and that no further restitution funds be given out to non-victims like me.

I declare under oath and under penalty of perjury that the foregoing is true and correct and that this declaration was signed on March 26 2022 at _Fresno CA 93706_

_Cher Pao Xiong_

037

# Exhibit E

Name _Pao Xiong_

Phone # _(916) 230-5652_

Address _7311 Mandy Drive_

Email _PXiong2009@gmail.com_

_Sacramento, CA 95823_

U. S. District Court of Minnesota
Financial Services Department
300 S. Fourth Street, Room 202
Minneapolis, MN 55415

October 10, 2022

RE: Restitution Payments USA v. Seng Xiong, case # 16-RC-167

To Whom It May Concern:

I, _Pao Xiong_____, had contributed to Mr. Seng Xiong prior to his arrest in March 2016 in the amount indicated below. While the Court would not return my contribution to Mr. Xiong, I request that it be sent to me so I can do whatever I want with the fund.

Total amount of contribution to Mr. Seng Xiong    $ _1,855.00_ (Receipts attached)

Total amount I have received from the Court/DOJ    $ _560.00_

The amount of restitution to be sent back to me    $ _1,295.00_

The information provided here is to the best of my knowledge and is accurate.

Signature _____    Date _04/26/2023_

Wells Fargo Bank
Transaction Receipt

STORE # 0000362 05          Deposit

Account Number            XXXXXX4810
  00300
Cash In                     $560.00
Number of checks                  0

Total Deposited             $560.00
Less Cash                   - $0.00
Net Deposit Amount          **$560.00**

Transaction # 060 0075
03:06PM  01/30/15 Credited: 01/30/15

If you do not have access to a retirement
plan at work, an IRA can be a great way to
save for retirement.


Thank you, Alejandra

---

Wells Fargo Bank
Transaction Receipt

Store #0000362 9          Deposit

Account Number            XXXXXX4810
CHK 00300                   $185.00
Cash In                     $185.00
Total Deposit

Deposit will be available:
Date                        Amount
03/02/2015                  $185.00


Transaction # 100 0130
10:32AM  03/02/15
Deposit Credit Date: 03/02/15


Thank you, Molia

Wells Fargo Bank
Transaction Receipt

Store #0000362 8                    Deposit

Account Number                XXXXXX4810
CHK 0030C
Cash In                            $185.00
Total Deposit                      $185.00

Deposit will be available:
Date                              Amount
04/02/2015                        $185.00


Transaction # 018 0027
10:59AM   04/02/15
Deposit Credit Date: 04/02/15


Thank you, Marta

Wells Fargo Bank
Transaction Receipt

Store #0000071 13                   Deposit

Account Number                XXXXXX4810
CHK 00300
Cash In                            $185.00
Total Deposit                      $185.00

Deposit will be available:
Date                              Amount
05/05/2015                        $185.00


Transaction # 033 0049
11:05AM   05/05/15
Deposit Credit Date: 05/05/15


Thank you, MELISSA

Wells Fargo Bank
Transaction Receipt

Store #0000071 8                  Deposit

Account Number                  XXXXXX4810
CHK 00300
  Cash In                          $185.00
Total Deposit                      $185.00

Deposit will be available:
Date                               Amount
06/16/2015                       $185.00


Transaction # 053 0067
11:44AM   06/16/15
Deposit Credit Date: 06/16/15


Thank you, TIEN

Wells Fargo Bank
Transaction Receipt

Store #0000071 11                 Deposit

Account Number                  XXXXXX4810
CHK 00300
  Cash In                          $185.00
Total Deposit                      $185.00

Deposit will be available:
Date                               Amount
07/07/2015                       $185.00


Transaction # 077 0152
11:56AM   07/07/15
Deposit Credit Date: 07/07/15


Thank you, PHIL

Wells Fargo Bank
Transaction Receipt

Store #000071 17                    Deposit

Account Number              XXXXXX4810
CHK 00300
Cash In                        $185.00
Total Deposit                  $185.00

Deposit will be available:
Date                            Amount
09/01/2015                     $185.00

Transaction # 089 0106
01:22PM   09/01/15
Deposit Credit Date: 09/01/15

Thank you, SIVASHNI

Wells Fargo Bank
Transaction Receipt

Store #000071 15                    Deposit

Account Number              XXXXXX4810
CHK 00300
Cash In                        $185.00
Total Deposit                  $185.00

Deposit will be available:
Date                            Amount
09/17/2015                     $185.00

Transaction # 041 0057
11:39AM   09/17/15
Deposit Credit Date: 09/17/15

Thank you, MABEE