1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    SENG XIONG, et al.,                        No.  2:23-cv-02531-DJC-SCR

12                    Plaintiffs,

13          v.                                    FINDINGS AND RECOMMENDATIONS

14    LAOS PEOPLE'S DEMOCRATIC
      REPUBLIC, et al.,

15
                      Defendants.
16

17          Plaintiffs proceed under the Alien Tort Statute ("ATS") and seek redress for an alleged

18    campaign against the Hmong people carried out in southeast Asia and in the United States.

19    Plaintiffs are represented by counsel.  The only defendant who has appeared in this action, Dr.

20    Yang Dao,[1] is proceeding pro se.  This action was accordingly referred to the undersigned

21    pursuant to Local Rule 302(c)(21) and 28 U.S.C. § 636(b).  ECF No. 18.

22          Now before the Court are Defendant Yang's Motion to Dismiss (ECF No. 12), Plaintiffs'

23    Motion for Default Judgment (ECF No. 22) as to the remaining defendants, and Plaintiffs'

24    Motion to Amend the Complaint (ECF No. 29).  Given the narrow scope of the ATS and the

25    nature of Plaintiffs' allegations against Defendants, the undersigned recommends that Defendant

26

27    _____

      [1]  The Complaint refers to this Defendant alternatively as Yang Dao and Dao Yang.  The motion
      to dismiss states his official name is "Dao Yang," but he is known by relatives and friends as Dr.

28    Yang Dao.  The Court will refer to him herein as Defendant Yang, or Dr. Yang.

                                          1

Yang's Motion to Dismiss be granted, Plaintiffs' Motion for Default Judgment be denied, and Plaintiff's Motion to Amend the Complaint be denied.

## I.    Factual Background and Procedural History

### A. Plaintiffs' Allegations

Plaintiffs Seng Xiong, Thaov Xiong, Lor Vang, and Lue Vang (collectively, "Plaintiffs") filed this action on November 2, 2023.  ECF No. 1.  Plaintiffs allege that they were born in Royal Laos and have lawful permanent resident status in the United States.  ECF No. 1 at 2-3.  Plaintiffs name as Defendants: (1) the Lao People's Democratic Republic ("PDR"); (2) President Thongloun Sisoulithis; (3) Prime Minister Sonxai Siphandon; (4) Minister of Justice Souansavan Vi-Gnaket; (5) Minister of Defense Chansamone Chanyalath; (6) Minister of Public Security Vilay Lakhamfong; and (7) Dr. Dao Yang.  *Id.* at 3-6.  Plaintiffs have been involved in a "Hmong Country mission" in the Fresno, California area since April 2014.  ECF No. 1 at ¶ 21.  Plaintiffs elsewhere refer to this as the "Hmong Homeland project," which apparently seeks to establish a Hmong national homeland.

Plaintiffs allege the Laos government has waged a genocidal campaign against Hmong people going back to 1972.  *Id.* at ¶ 63; *see also id.* at ¶ 9 (Laos government has "conducted a policy to maim and terminate Hmong people" that included killing, rape, and torture).  They connect this "campaign of horrors" to Hmong people's association with the CIA during the CIA's "secret war in Laos during the Vietnam War era."  *Id.* at ¶ 95.  Each Plaintiff is seeking $20 million in damages from each Defendant.  *Id.* at ¶ 123.  Plaintiffs also seek injunctive relief to prevent "the defendants and each of them from taking any further efforts to interfere with the Plaintiffs' program to establish a Hmong Homeland somewhere on this Earth."  *Id.* at ¶ 124.

Plaintiffs allege that Dr. Yang lives in the United States and works on behalf of the Laos government "to spy on Hmong political activities in the United States," and report back to Laos government.  *Id.* at ¶ 20.  Plaintiffs allege Dr. Yang's spying has gone on since 2007, and has taken place in California, Minnesota, Oklahoma, and Washington, D.C.  *Id.* at ¶ 27.

A number of Plaintiffs' allegations appear to relate to *United States v. Harrison Ulrich Jack, et al.*, Case No. 2:07-cr-266 FCD ("*United States v. Jack*"), a criminal case that commenced

1    in this District in 2007.  That case alleged violations of numerous federal laws, including the

2    Neutrality Act, 18 U.S.C. § 960, based on alleged attempts by the defendants to orchestrate from

3    California underground military activities in Laos.  This Court eventually dismissed all charges in

4    the case.  *See United States v. Jack*, ECF No. 688.  Plaintiffs in the instant case allege they do not

5    know if Dr. Yang played any role in *United States v. Jack*, but he "may" have individuals

6    covertly working for him, and that Dr. Yang is "anti our Hmong Country Mission."  ECF No. 1 at

7    ¶¶ 28-29.  The Complaint also refers to an unsuccessful malicious prosecution lawsuit concerning

8    *United States v. Jack*.[2]  *Id*. at ¶¶ 32-33.

9        The Complaint also alleges that false wire fraud and mail fraud charges were brought

10   against Plaintiff Seng Xiong.[3]  *Id*. at ¶ 44.  It claims "money" from "donors" "was taken in the

11   prosecution of Mr. Seng Xiong," "kept in a trust by the US attorney, and never returned back to

12   these donors[.]"  *Id*. at ¶ 51.

13       Plaintiffs sue under the ATS "based on activities of Lao PDR spies creating these bizarre

14   criminal cases that were done in an entirely fraudulent and false manner based on false

15   information provided by Lao PDR spies acting in the United States."  ECF No. 1 at ¶ 54.

16   Plaintiffs allege that Defendant Yang "lobbied" a "key witness" in the criminal case against

17   Plaintiff Xiong "to work and cooperate with him."  *Id*. at ¶ 59.  In addition to Defendant Yang,

18   Plaintiffs allege that at least two other known Lao PDR "spy operatives" are "working inside the

19   territory of the United States" to report information on Hmong political activities back to Laos

20   government officials.  *Id*. at ¶ 56.  This spying activity allegedly "occur[s] at a substantial level in

21   Fresno, California and other locations within the Eastern District of California."  *Id*. at ¶ 57.

22   Plaintiffs further allege that Defendant Yang "gave false police reports to the Minnesota Police

23

24

25   [2]  The plaintiff in that malicious prosecution lawsuit was Nhia Vang; none of the four Plaintiffs in
     the instant case appear to have been involved in that lawsuit.  That case was ultimately dismissed,
     with the Ninth Circuit affirming the dismissal.  *See Nhia Kao Vang v. Decker*, 705 F.App'x 623

26   (9th Cir. 2017).

27   [3]  Despite Plaintiffs' allegation that these charges were false, Mr. Xiong's conviction and 87-
     month sentence were affirmed by the Eighth Circuit.  *See United States v. Xiong*, 914 F.3d 1154
     (8th Cir. 2019) (wire fraud and mail fraud conviction in apparent connection with fundraising for

28   establishment of a Hmong homeland).

1  department that the Hmong homeland program was actually some kind of illegal gambling ring."

2  ECF No. 1 at ¶ 101.

3  **B. Prior, Related ATS Lawsuit**

4  In 2015, the same attorney representing Plaintiffs in this case filed a putative class action

5  raising claims under the ATS against the Laos PDR and several high-level Government officials.

6  *See Hmong I, a fictitious name v. Lao People's Democratic Republic, et al.*, Case No. 2:15-cv-2349

7  TLN AC ("*Hmong I*"). In that case, the plaintiffs similarly moved for default judgment. *See*

8  *Hmong I*, ECF No. 19. Magistrate Judge Claire recommended that the motion for default judgment

9  be denied, the President and Prime Minister of Laos be dismissed on the basis of sovereign

10  immunity, and that an order to show cause be issued as to why the entire action should not be

11  dismissed for lack of jurisdiction. *Id*., ECF No. 34. Judge Nunley adopted these recommendations

12  in full. *Id*., ECF No. 40.

13  Given that the ATS does not apply extraterritorially, the Court appeared to lack jurisdiction

14  over the claims concerning alleged actions that occurred in Laos. *Id*., ECF No. 34 at 12. Plaintiffs

15  were given leave to amend to show a sufficient nexus to the United States. The Court also found

16  that the PDR and its President and Prime Minister were immune from suit under the Foreign

17  Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1604, *et seq*. *Id*., ECF No. 34 at 12-14. However,

18  as to the individual defendants, the Court's decision was based on the United States filing a

19  suggestion of immunity, with the U.S. Department of Justice participating in the case because the

20  plaintiffs had also sued the United States and the CIA.

21  Judge Nunley gave the plaintiffs 30 days to respond to the OSC on jurisdiction. The

22  plaintiffs responded to the OSC and filed a motion for leave to amend and a proposed first amended

23  complaint ("FAC"). *Id*., ECF No. 43-1. Judge Nunley considered the factual allegations in the

24  proposed FAC. Just as in this case, the FAC made allegations of alleged malicious prosecution in

25  the United States: "Plaintiffs assert that the fact that the dismissed case for malicious prosecution

26  and the criminal case underlying it took place in the United States with different parties, different

27  claims, and different events, supports federal jurisdiction over this matter. Plaintiffs have not

28  explained why this might be so nor provided any authority to support their assertion." *Id*., ECF

4

No. 55 at 3 n.3.  Judge Nunley found that the alleged atrocities occurred in Laos, and although plaintiffs made allegations of some events in the United States, those "events do not form the basis of any of their claims." *Id.*, ECF No. 55 at 7.

The Court found further leave to amend would be futile.  *Id.*, ECF No. 55 at 8.  Plaintiffs appealed to the Ninth Circuit, which affirmed the judgment.  The Ninth Circuit found the ATS did not apply extraterritorially, and that plaintiffs' allegations of domestic conduct were insufficient to establish jurisdiction under the ATS.  *Id.*, ECF No. 60 (Mem. Dispo., 9th Cir. Case No. 17-16828).

### C.  Pending Motions

On January 23, 2024, Defendant Dr. Yang filed a Motion to Dismiss.  ECF No. 12.  On February 5, 2024, the Clerk entered default as to the six other Defendants.  ECF No. 15.  The previously assigned magistrate judge took the Motion to Dismiss under submission on February 27, 2024.  ECF No. 20.  On August 6, 2024, this case was reassigned to the undersigned.  ECF No. 21. Plaintiffs filed their Motion for Default Judgment on September 5, 2024.  ECF No. 22.

On November 21, 2024, the undersigned heard oral argument on Defendant Yang's Motion to Dismiss and Plaintiffs' Motion for Default Judgment.  Plaintiffs later filed their Motion for Leave to Amend the Complaint (ECF No. 29), which the Court took under submission without oral argument.

### II.    The Alien Tort Statute

Plaintiffs seek relief under the Alien Tort Claim Act, also known as the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS").  First enacted as part of the Judiciary Act of 1789, the ATS now provides in its entirety: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or of the United States."  While individuals aggrieved by alleged violations of international law could at one time pursue a range of legal theories under the ATS, the Supreme Court has dramatically restricted the reach of the ATS in recent decades.

Starting with *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court began announcing limitations on the substantive scope of the ATS.  *Sosa* concerned the abduction and extradition to the United States, by individuals purportedly working at the behest of the Drug

1    Enforcement Administration (DEA), of a Mexican physician implicated in the torture and murder

2    of a DEA agent.  The physician sued under the ATS, alleging his "arbitrary arrest and detention"

3    violated "the law of nations." *Id.* at 698, 733.  In evaluating the viability of this theory, the Supreme

4    Court concluded that Congress, by enacting the ATS, had in mind "three primary offenses: violation

5    of safe conducts, infringement of the rights of ambassadors, and piracy." *Id*. at 724.  "[F]ederal

6    courts should not recognize private claims … for violations of any international law norm *with less*

7    *definite content and acceptance among civilized nations* than [these three] historical paradigms

8    familiar when § 1350 was enacted." *Id*. at 732 (emphasis added).  The ATS thus creates jurisdiction

9    only over international law norms that are "specific, universal, and obligatory." *Id*. at 732

10   (quotation omitted).  The Supreme Court applied these standards to the physician's cause of action,

11   holding that "a single illegal detention of less than a day, followed by the transfer of custody to

12   lawful authorities and a prompt arraignment, violates no norm of customary international law so

13   well defined as to support the creation of a federal remedy." *Id*. at 738.

14        In subsequent decisions, the Supreme Court announced another major limitation on the

15   scope of the ATS: it does not apply extraterritorially.  In *Kiobel v. Royal Dutch Petroleum, Co*, a

16   group of Nigerian nationals residing in the United States sued an oil company and other

17   corporations under the ATS, alleging they aided and abetted the Nigerian government's atrocities

18   against civilians in Nigeria.  569 U.S. 108, 112 (2013).  The Supreme Court "conclude[d] that the

19   presumption against extraterritoriality applies to claims under the ATS, and that nothing in the

20   statute rebuts that presumption." *Id*. at 124.  Given that "all the relevant conduct" in *Kiobel* "took

21   place outside the United States," the action could not proceed. *Id*. at 124-25.  Then, in *Nestle USA,*

22   *Inc. v. Doe* (*Nestle*), the Supreme Court addressed the reach of the ATS when plaintiffs allege that

23   domestic corporate activity is at the heart of foreign violations of international law.  593 U.S. 628,

24   630 (2021).  In *Nestle*, plaintiffs sought to hold domestic corporations liable for forced child labor

25   in Africa on the theory that corporate financing and operational decisions underlying the child labor

26   occurred in the United States. *Id*. at 631-32.  The Supreme Court disagreed, holding that such

27   "allegations of general corporate activity—like decisionmaking—cannot alone establish domestic

28   application of the ATS." *Id*. at 634.

1    Despite these restrictive interpretations of the ATS articulated by the Supreme Court, the

2    Ninth Circuit continues to recognize "aiding and abetting liability" as "a norm of customary

3    international law with sufficient definition and universality to establish liability under the ATS."

4    *Doe I v. Cisco Systems, Inc.*, 73 F.4th 700, 717 (9th Cir. 2023), *pet'n for reh'g denied* 114 F.4th

5    1230 (9th Cir. 2024).  In defining the standard for aiding and abetting liability under the ATS, the

6    Ninth Circuit held that "the *actus reus* of aiding and abetting liability requires assistance to the

7    principal with substantial effect on an international law violation."  *Id*. at 725.  The Court examines

8    Plaintiffs' ATS claims against this body of precedent.

9    **III.    Dr. Yang's Motion to Dismiss**

10    Defendant Dr. Yang's motion to dismiss is a three-page letter.  ECF No. 12.  It does not

11    specifically invoke Federal Rule of Civil Procedure 8 or 12, but requests the Court to "summarily

12    dismiss" the complaint and all allegations against him.  ECF No. 12 at 1.  Dr. Yang states he was

13    personally served in Minnesota, and that he is a "former Hmong refugee."  *Id.*  He states he is 81

14    years old, resides in Minnesota, and has "never known, interacted with, or met" any of the Plaintiffs.

15    *Id.*  Dr. Yang states that he is familiar with Plaintiff Seng Xiong and that Mr. Xiong has been

16    convicted of mail and wire fraud.  *Id.* at 2.  Dr. Yang argues that the complaint "fails to establish

17    jurisdiction, venue, or state a claim from which relief can be granted."  *Id.*  Dr. Yang argues that

18    the case is "frivolous" and brought in "bad-faith."  *Id.* at 3.

19    Plaintiffs' opposition to Dr. Yang's motion is a 25-page memo followed by over 40 pages

20    of exhibits.  ECF No. 16.  Plaintiffs argue that the complaint sufficiently alleges subject matter

21    jurisdiction and that they have alleged a "substantial occurrence" of events occurring within

22    California.  ECF No. 16 at 17-23.[4]  Plaintiffs argue that this Court has jurisdiction because they

23    have alleged that Dr. Yang spied "inside the territory of the United States."  *Id.* at 18.  Plaintiffs

24    rely on *Sexual Minorities Uganda v. Lively*, 960 F.Supp.2d 304, 323-24 (D. Mass. 2013) to support

25    their argument.  Plaintiffs argue venue is proper in this District in part by virtue of a "bizarre scam

26    case filed by the US attorney's office against Hmong heroes," which the Court understands to be a

27

28    _____
[4]  These page references are to the CM/ECF generated header.

1  reference to *United States v. Jack*.

2       While Dr. Yang is likely correct that the record in this case is insufficient to establish this

3  Court's personal jurisdiction over him, the Court need not reach that question because Plaintiffs'

4  allegations fail to establish the Court's subject matter jurisdiction under the ATS.  Plaintiffs make

5  vague allegations about Dr. Yang's purported spying against the Hmong community in the United

6  States on behalf of the PDR.  Based on the Complaint and counsel's argument at the November

7  2024 hearing, the Court understands that Plaintiffs believe Dr. Yang violated international law

8  norms by spying, filing a false police report in Minnesota, and interfering with the Hmong people's

9  right to a homeland.  ECF No. 1 at ¶¶ 101-105.  Plaintiffs cite no case law establishing that any of

10  these theories are actionable under the ATS.  Spying—to the extent that it involves invasion of

11  privacy—and the filing of a false police report—to the extent it involves malicious prosecution—

12  are simply generic state-law torts, not violations of the "law of nations."  *See, e.g., Sanders v.*

13  *American Broadcasting Companies, Inc.,* 20 Cal.4th 907, 914 (1999) (common law tort of invasion

14  of privacy by intrusion "has two elements: (1) intrusion into a private place, conversation or matter,

15  (2) in a manner highly offensive to a reasonable person"); *Hagberg v. California Federal Bank*

16  *FSB*, 32 Cal.4th 39 (2004) (knowingly filing a false police report can only create tort liability if a

17  plaintiff otherwise establishes the elements of malicious prosecution).

18       As for interference with the Hmong people's purported right to a homeland, it is true that

19  international law broadly guarantees the right to self-determination.  *See, e.g.,* United Nations

20  Charter, art. 1; Declaration on the Granting of Independence to Colonial Countries and Peoples,

21  G.A. Res. 1514 (XV) (1960).  However, the Court need not (1) determine whether the right to self-

22  determination includes the right of a people to establish a homeland, and (2), if it does, follow the

23  process required by *Sosa* of evaluating whether to recognize a new cause of action under the ATS

24  for interference with that right.  Assuming for the sake of argument that such interference is

25  actionable under the ATS, the allegations against Dr. Yang are so insubstantial as to fail to remotely

26  show such interference.  As noted above, Plaintiffs' allegations against Dr. Yang are vague and fail

27  to suggest that anything he did meaningfully impaired the Hmong community's ability to establish

28  a homeland.  Plaintiffs emphasize the purported role Dr. Yang played in Plaintiff Xiong's fraud

prosecution in Minnesota, but Plaintiff Xiong was in fact convicted of that fraud. *See United States v. Xiong*, 914 F.3d 1154 (8th Cir. 2019) (upholding wire fraud and mail fraud convictions on appeal). Even under an aiding and abetting theory, Plaintiffs' vague allegations against Dr. Yang are not actionable. *Doe I*, 73 F.4th at 725 (holding that under the ATS, "the *actus reus* of aiding and abetting liability requires assistance to the principal with substantial effect on an international law violation").

*Sexual Minorities Uganda* is materially distinguishable. The defendant in that case lived in Massachusetts and provided direct and material assistance to officials in Uganda who crafted legislation making homosexuality punishable by death. *See* 960 F.Supp.2d at 323-24. The detailed allegations in that case stand in sharp contrast to the vague allegations against Dr. Yang in the instant case. Plaintiffs allege a longstanding campaign by the PDR and its leadership against the Hmong people in Laos and in the United States. But they do not sufficiently allege that anything Dr. Yang did assisted in crimes carried out against the Hmong people or otherwise harmed the Hmong people.

## IV.  Plaintiffs' Motion for Default Judgment

### A.  Legal Standard

Pursuant to Federal Rule of Civil Procedure 55, default may be entered against a party against whom a judgment for affirmative relief is sought who fails to plead or otherwise defend against the action. *See* Fed. R. Civ. P. 55(a). However, "[a] defendant's default does not automatically entitle the plaintiff to a court-ordered judgment." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F.Supp.2d 1172, 1174 (C.D. Cal. 2002) (citing *Draper v. Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986)); *see* Fed. R. Civ. P. 55(b) (governing the entry of default judgments). Instead, the decision to grant or deny an application for default judgment lies within the district court's sound discretion. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In making this determination, the court may consider the following factors:

> (1)  the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether

1
2
the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

3
4
*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Default judgments are ordinarily disfavored.  *Id.* at 1472.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
As a general rule, once default is entered, well-pleaded factual allegations in the operative complaint are taken as true, except for those allegations relating to damages.  *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); *see also Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).  Although well-pleaded allegations in the complaint are admitted by a defendant's failure to respond, "necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default."  *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)); accord *DIRECTV, Inc. v. Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) ("[A] defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law") (citation and quotation marks omitted); *Abney v. Alameida*, 334 F.Supp.2d 1221, 1235 (S.D. Cal. 2004) ("[A] default judgment may not be entered on a legally insufficient claim.").  A party's default conclusively establishes that party's liability, although it does not establish the amount of damages.  *Geddes*, 559 F.2d at 560; *cf. Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1414 (9th Cir. 1990) (stating in the context of a default entered pursuant to Federal Rule of Civil Procedure 37 that the default conclusively established the liability of the defaulting party).

21
**B.  Service**

22
23
24
25
26
27
The Motion for Default Judgment (ECF No. 22) does not address the issue of service, but instead relies upon the Clerk's entry of default (ECF No. 15) as to 6 of the 7 Defendants.  Plaintiff has filed returns of service.  ECF Nos. 5 to 11.  The returns attest that the foreign Defendants were served by way of international federal express.  This may be sufficient service.  *See* 28 U.S.C. § 1608(a)(3); *Republic of Sudan v. Harrison*, 587 U.S. 1 (2019).  Under § 1608(a)(3) a foreign state may be served by "sending a copy of the summons and complaint and a notice of suit, together with

28

1    a translation of each into the official language of the foreign state, by any form of mail requiring a

2    signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry

3    of foreign affairs of the foreign state concerned."  Plaintiffs' returns of service state a translation of

4    the summons and a press release were included in the service packets, but do not state the Complaint

5    was translated.  *See for example* ECF Nos. 6 at 3; 7 at 3; 8 at 3.  Because the Court resolves the

6    propriety of default judgment under certain of the *Eitel* factors, it need not determine whether

7    service was effective despite the apparent failure to include a translated version of the Complaint.

8                                    **C.  Application of the *Eitel* factors**

9           As set forth above in the discussion of the Motion to Dismiss, the Complaint fails to

10   establish subject matter jurisdiction under the ATS as to Dr. Yang.  The Complaint also fails to

11   establish subject matter jurisdiction under the ATS as to the defaulting PDR Defendants.  Those

12   Defendants are the PDR itself and high-ranking PDR government officials.  As was true in *Hmong*

13   *I*, they are immune from suit under the FSIA.  *See* Case No. 2:15-cv-2349, ECF No. 34 at 12-14.

14          Even if they were not immune from suit, the allegations against them largely concern

15   foreign activities that—standing alone—are not actionable under the ATS.  To be clear, the

16   atrocities alleged to have been committed against the Hmong people abroad are disturbing.  But

17   Plaintiffs have not shown that those alleged atrocities "touch and concern the territory of the United

18   States" "with sufficient force to displace the presumption against extraterritorial application."

19   *Mujica v. AirScan, Inc.*, 771 F.3d 580, 591 (9th Cir. 2014).  To the contrary, as noted with respect

20   to Dr. Yang's Motion to Dismiss, *supra*, Plaintiffs' domestic allegations are limited to spying,

21   fabrication of evidence, and the like—activities which, in any event, are alleged to have occurred

22   decades after the atrocities that began in the 1970s.[5]

23          Despite the fact that Plaintiffs' counsel also represented the putative class in *Hmong I*, and

24   that this Court dismissed *Hmong I* in part based on extraterritoriality, Plaintiffs' counsel does not

25

26   _____

27   [5]  Although the Court's recommendation does not rest upon the statute of limitations, the
     majority, if not all, of the primary allegations in the Complaint are likely time-barred.  *See*
     *Deutsch v. Turner Corp.*, 324 F.3rd 692, 717 (9th Cir. 2003) ("The statute of limitations under the
28   ATCA is 10 years.").

1    meaningfully engage with *Kiobel* or any post-*Kiobel* authority on the ATS and extraterritoriality.[6]

2    *See* ECF No. 16 at 17.  Plaintiffs instead rely on *Sexual Minorities Uganda*, 960 F.Supp.2d at 323-

3    24.  But this Court rejected the applicability of that case in the context of similar allegations in

4    *Hmong I.  See* 2017 WL 3581914 at *5 (referring to *Sexual Minorities Uganda* as one of three cases

5    plaintiffs cite "without explanation for how those cases would support plaintiff's assertions" and

6    concluding "the cases do not lend such support," but rather the facts alleged were analogous to

7    *Kiobel*).  In short, this is not a lawsuit where Plaintiffs can sue under the ATS for alleged foreign

8    atrocities.

9         The *Eitel* factors, particularly factors two, three, and seven weigh strongly against the entry

10    of default judgment.  The court cannot enter default judgment in the absence of jurisdiction.  *See*

11    *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) ("[T]he fact that Iraq failed to plead or appear in the

12    action makes no difference.  When entry of judgment is sought against a party who has failed to

13    plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over

14    bot the subject matter and the parties . . . To avoid entering a default judgment that can later be

15    successfully attacked as void, a court should determine whether it has the power, i.e., the

16    jurisdiction, to enter the judgment in the first place."); *Hmong I v. Lao People's Democratic*

17    *Republic*, 748 F.App'x 136 (9th Cir. 2019) ("Because Plaintiff does not allege facts sufficient to

18    establish federal jurisdiction, the district court could not have granted her default judgment.")

19    (*citing Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("When a federal court concludes that it

20    lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety.")).  Plaintiffs'

21    motion for default judgment should be denied.

22

23

---

24    [6]  Plaintiffs' opposition ignores *Nestle* and *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 243 (2018),
      which concerned acts of terrorism.  In *Jesner*, the Supreme Court held that ATS liability did not
25    extend to foreign corporations: "foreign corporations may not be defendants in suits brought under
      the ATS."  In so doing, the Supreme Court noted that the ATS "was intended to promote harmony
26    in international relations by ensuring foreign plaintiffs a remedy for international-law violations
      when the absence of such a remedy might provoke foreign nations to hold the United States
27    accountable."  *Id.* at 243.  As the Supreme Court reasoned, the *Jesner* litigation had the opposite
      effect of creating foreign relations tensions by allowing foreign nationals to sue a foreign
28    corporation in U.S. court based on "relatively minor connection" with the terrorist acts and the
      alleged conduct in the U.S.  *Id.*

1          **V.      Plaintiffs' Motion for Leave to Amend**

2          On February 13, 2025, Plaintiffs sought leave to file a first amended complaint ("FAC")

3    to address the Court's statements made at the November 21, 2024 hearing regarding the

4    deficiencies of the Complaint.  ECF No. 29 at 3-4.  Specifically, the FAC would add three new

5    sections to the Complaint, concerning: (1) a lawsuit filed by Defendant Yang in St. Paul against

6    members of the Hmong community, which purportedly shows that Defendant Yang was a spy for

7    the PDR; (2) "A Specific Example of [Defendant Yang's] Conduct, at the Request of the Laos

8    Community Government is in the Form of a Published YouTube Video," and (3) "Further

9    Statement of Particulars in support of Claims Against the Defendants," which includes allegations

10   invoking international law as it relates to Plaintiffs, "who are in the category of stateless

11   persons[.]"  *Id*. at 2.  Plaintiffs submitted a red-line version of the proposed FAC.  ECF No. 29-2

12   at 7 to 98.  The proposed FAC also attaches numerous exhibits totaling nearly 300 pages.  The

13   Court recommends the motion for leave to file the FAC be denied because none of the proposed

14   amendments cure the defects either as to Dr. Yang or as to the PDR Defendants identified above.

15         In the FAC, Dr. Yang is alleged to be working as a spy for PDR and to have been spying

16   since 2007.  ECF No. 29-2 at ¶¶ 20, 27.  As to the case in 2007 against Vang Pao and 11 Hmong

17   individuals, Plaintiffs "are not sure how much or if Dr. Yang Dao played any role."  *Id.* at ¶ 28.

18   Plaintiffs allege that new information from a state court lawsuit informs them that Dr. Yang met

19   with Laos officials and there was a meeting in 1999.  *Id.* at ¶¶ 64, 66.  Plaintiffs allege that Dr.

20   Yang advocated against the creation of a Hmong homeland.  *Id.* at ¶¶ 69-72, 85.  Plaintiff further

21   alleges that Dr. Yang provided information around the timeframe of July 2000, that led to a

22   malicious prosecution.[7]  These are just slightly more detailed allegations that Dr. Yang spied,

23   contributed information to a prosecution, and advocated against the establishment of a Hmong

24   homeland.  These allegations are not actionable under to show Dr. Yang violated the ATS as a

25   principal.  They also do not state a claim of aiding and abetting liability in that they do not show

26   _____

27   [7]  This may be another reference to the investigation leading to the *United States v. Jack* case in
     2007.  Although the Court's recommendations do not rest upon the statute of limitations, the
28   majority of allegations concerning Dr. Yang are likely time-barred.  *See Deutsch*, 324 F.3rd at
     717 ("The statute of limitations under the ATCA is 10 years.").

Dr. Yang "provided assistance with a substantial effect on cognizable violations of international law." *See Doe I v. Cisco Systems, Inc.*, 73 F.4th 700, 728 (9th Cir. 2024).

In determining whether further leave to amend would be futile, the Court has also considered the fact that Plaintiff's counsel previously brought the *Hmong I* lawsuit on behalf of unnamed plaintiffs and the action was dismissed because the ATS does not apply extraterritorially. As discussed *supra* at page 4, in that case plaintiffs filed a first amended complaint that the Court concluded "cannot demonstrate federal jurisdiction and further attempts to amend would be futile." 2017 WL 3581914 at *5. The Ninth Circuit affirmed the judgment of this Court, including the denial of leave to amend, and noted that although the proposed FAC contained "allegations of domestic conduct" those allegations were not sufficient. *See Hmong I v. Lao People's Democratic Republic*, 748 F.App'x 136, 137 (9th Cir. 2019).

In reviewing the Complaint and the FAC, and in light of the limited scope of the ATS under recent precedent, it is clear that further amendment would be futile. *See Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir. 1999) ("Where the legal basis for a cause of action is tenuous, futility supports the refusal to grant leave to amend."). Accordingly, the Court recommends dismissal of the Complaint as to all Defendants without further leave to amend.

## VI.    Conclusion

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Yang's Motion to Dismiss (ECF No. 12) be GRANTED;

2. Plaintiffs' Motion for Default Judgment (ECF No. 22) be DENIED;

3. Plaintiffs' Motion to Amend (ECF No. 29) be DENIED;

4. The Complaint be dismissed for lack of jurisdiction; and

5. The Clerk be directed to enter judgment and close this case.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, either party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's

14

1    Findings and Recommendations."  The parties are advised that failure to file objections within the

2    specified time may result in waiver of the right to appeal the district court's order.  *Martinez v.*

3    *Ylst*, 951 F.2d 1153 (9th Cir. 1991).

4    DATED: April 24, 2025

5

6                                                                SEAN C. RIORDAN
                                                                UNITED STATES MAGISTRATE JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28